**UNITED STATES of America,**
**Plaintiff**

v.

**James R. HOFFA, Henry Lower, and**
**Robert E. McCarthy, Jr.,**
**Defendants.**

**Cr. No. 1241.**

United States District Court
S. D. Florida,
Orlando Division.
July 12, 1961.

6. See Footnotes 1 and 2 for the first two questions and page 23, supra, for the third question.

**26**

Edward F. Boardman, U. S. Atty., Miami, Fla., James T. Dowd and Marie L. McCann, Sp. Attys., U. S. Department of Justice, Washington, D. C., for United States.

Julius F. Parker, Tallahassee, Fla., Fuller Warren, Miami, Fla., Charles E. Davis, Orlando, Fla., Jacob Kossman, Philadelphia, Pa., James E. Haggerty, Detroit, Mich., Daniel B. Maher, Washington, D. C., for defendant, James R. Hoffa.

O. B. Cline, Jr., Miami, Fla., for defendant, Henry Lower.

Robert E. Toohey, Detroit, Mich., for defendant, Robert E. McCarthy, Jr.

LIEB, District Judge.

This cause came on to be heard by the Court upon the various motions of the several defendants attacking the validity and sufficiency of the indictment returned against them by the Grand Jury which was convened in the Orlando Division of the Southern District of Florida.

The indictment is in twelve counts. Counts numbered 1, 2, 3, 5, 8, 9, 10 and 11 charged all of the defendants with use of the mails at various times in 1956 and 1957 in furtherance of a scheme to defraud labor associations chartered by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and members of such associations, and for obtaining money and property from those associations, their members, and other persons who would be induced to purchase parcels of land from Sun Valley, Inc., a Florida corporation, by means of false and fraudulent pretenses, representations and promises in violation of Sections 1341 and 1342, Title 18 U.S.Code.

Counts numbered 4, 6, 7 and 12 of the indictment charged all defendants with use of telephone and telegraph in furtherance of the same scheme in violation of Section 1343, Title 18 U.S.Code.

Defendant Hoffa was president of the said organization of Teamsters. The defendant Lower was an officer of Automobile Drivers and Demonstrators Local Union No. 376 of Detroit, Michigan, alleged in the indictment to be a labor association chartered by the Teamsters. Defendant McCarthy was manager of a branch of the Bank of the Commonwealth at Detroit, Michigan.

The motions filed by the defendants and heard by the Court were the following:

1. The several motions filed by each of the defendants to dismiss the indictment upon the ground that the grand jury was improperly selected.

2. The several motions filed by each of the defendants to dismiss the indictment for failure to state facts sufficient to constitute an offense against the United States.

3. The several motions of each of the defendants for a severance and separate trial from each of the other defendants.

4. The several motions of defendants Hoffa and McCarthy for a bill of particulars.

5. The motion of defendant Lower to strike portions of the indictment.

6. The motion of defendant McCarthy for an order transferring the case as to him to the Eastern District of Michigan.

7. The motion of defendant Hoffa to dismiss the indictment on the ground that the offense, if any, in Count 4 is triable only in the Miami Division of the Southern District of Florida or in the Eastern District of Michigan.

Evidence was taken for several days in open Court on said motions and briefs were filed by counsel for all parties. After consideration of the said evidence and briefs, it is the opinion of the Court that the several motions to dismiss the indictment upon the ground that the grand jury was improperly selected should be granted, thereby rendering moot all of the other said motions, and they will not be considered further in this order.

The attacks upon the legality of the grand jury which returned the indictment are based upon two main contentions:

*First*: It is contended that the jury commissioner who acted with the deputy clerk in selecting the jury panel from which the grand jury was drawn was not a well-known member of the principal party in the district opposing that to which the clerk or his deputy then belonged, in violation of Section 1864, Title 28 U.S.Code.

*Second*: It is contended that the jury commissioner and the deputy clerk, in selecting the names of persons to be placed by them in the jury box and from among which the grand jury was drawn, limited their selections exclusively to registered voters of the four counties of the division of the district, and in the case of women, further limited their selections of those who had registered to vote to those who also had volunteered for jury service, thereby not providing a panel which was a fair cross section of the community, as required by law.

The grand jury which returned the indictment in the case was impanelled on February 15, 1960, after their names were drawn from a jury box which then contained approximately 1,350 names, of which approximately 400 were old names which had been selected and placed therein prior to June 11, 1959, and approximately 950 were names which had been selected and placed therein on June 11, 1959, by the deputy clerk of Court, Mildred Durrance, and jury commissioner Alan K. Bixby. All of the names in the jury box were of persons eligible for jury duty and residents of the four counties comprising the Orlando Division of the Southern District of Florida, and every one of these persons was a qualified and registered voter under the laws of Florida.

The evidence shows without dispute that at all times pertinent thereto, Julian Blake was Clerk of the United States District Court for the District, and Mildred Durrance was his resident deputy at Orlando, Florida. During all of said period, both of them were registered members of the Democratic Party. Jury Commissioner Bixby was appointed to that office by one of the Judges of this Court on January 11, 1950, and has served as such commissioner continuously ever since without reappointment as there is no fixed term to said office.[1] At the time of his said appointment, Mr. Bixby was a registered member of the Republican Party and well known as such, being then Chairman of the Republican County Executive Committee for Orange County, Florida. He remained registered as a Republican until April, 1956, when he changed his political registration in Orange County to Democratic and remained registered in the office of the Supervisor of Registration of that county as a Democrat until January, 1961, at which time he changed his registration back to Republican and was registered as such at

---

1. Gaughan v. United States, 8 Cir., 19 F. 2d 897.

the time of the hearing on motions. During the period Mr. Bixby was registered to vote as a member of the Democratic Party, the 950 names were selected and added to the jury box by him and Mrs. Durrance, and from the box so filled the grand jury was drawn.

Section 1864 of Title 28 U.S.Code, which controls the selection of juries, provides in part as follows:

"The names of grand and petit jurors shall be publicly drawn from a box containing the names of not less than three hundred qualified persons at the time of each drawing.

"The jury box shall from time to time be refilled by the clerk of court, or his deputy, and a jury commissioner, appointed by the court.

"Such jury commissioner shall be a citizen of good standing, residing in the district and a well known member of the principal political party in the district, opposing that to which the clerk, or his deputy then acting, may belong. He shall receive $5 per day for each day necessarily employed in the performance of his duties."

At the time of his appointment, Mr. Bixby possessed all the required qualifications for the office of jury commissioner. The question is whether he was entitled to act in that office after he changed his party registration.

There is no evidence that any of the Judges of this Court, or any member of the clerk's staff, knew of Bixby's change of registration until it was pleaded in this cause after the indictment was returned.

The statute provides for the appointment of the jury commissioner as the act of the Court, and the provisions with regard to the qualifications of the commissioner obviously relate to the time of his appointment. It has been held generally, by the courts that have considered this question, that the provisions regarding the qualifications of the commissioner are only directory to the appointing court and not mandatory. See United States v. Chaires, C.C., 40 F. 820; United States v. Caplis, D.C., 257 F. 840; Brookman v. United States, 8 Cir., 8 F.2d 803.

As these cases point out, the statute relates to the qualifications of the jury commissioner at the time of his appointment by the Judge and not to all times after appointment. It could hardly be expected that the court would be able to maintain surveillance of the jury commissioner so as to know at all times after his appointment that he was a citizen in good standing and a well-known member of a political party or even to be aware of any change in his party affiliation or the party affiliations of the clerk or his deputy.

Since the said appointment was made in full compliance with law, this challenge to the validity of the indictment is without merit.

However, the motions to dismiss the indictment, because of the manner in which the names of the jury men and women were selected and the evidence supporting the motions, disclose that the jury was selected contrary to the mandatory requirements of law, and these motions must be granted.

Prior to September 9, 1957, the Federal Statute (Title 28, § 1861, U.S.C.A.) required that a juror in the United States District Court must be competent to serve as a grand or petit juror by the law of the state in which the District Court is held. The Civil Rights Act of 1957 amended this section so as to remove such requirement and to declare, as competent to serve as such juror, any citizen of the United States who has attained the age of twenty-one years and has resided for a period of one year within the judicial district unless:

1. He has been convicted in a State or Federal Court of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty;

2. He is unable to read, write, speak and understand the English language;

3. He is incapable, by reason of mental or physical infirmities, to render efficient jury service.

From the date of this amendment, and at the time of the selection of the names added to the jury box for the drawing of the grand jury on June 11, 1959, the limitations upon jury selection under the Florida State laws, including a requirement that a prospective juror must be a registered voter, were no longer to be considered in selecting jurors in Federal Courts. Indeed, this very requirement of registration to vote, existing in many states, was one of the prime reasons for the change in the Federal Statute by Congress.

█ Apparently the jury commissioner and the deputy clerk were either unaware of the change of the law or forgot about it, for they deliberately and exclusively limited their selection of names for the jury box to those persons who were then registered to vote and, in the case of women, to those who had also volunteered for jury service in the State Court. Moreover, in the three counties of Orange, Osceola and Brevard, the names selected were further limited to those appearing on the lists of jurors then selected for service in the State Courts of said counties.

Under the said procedure followed by the jury commissioner and the deputy clerk in selecting the names for the jury box, the percentage of qualified citizens deliberately excluded from serving on the jury was extremely high.

Although it is urged that the non-compliance involved is only an inconsequential or technical defect with no real prejudice shown to have resulted therefrom, it is the opinion of the Court that, in the light of the controlling decisions of the Supreme Court of the United States, the importance of preserving the integrity of the jury system, and the duty of the Court to require Court officials to comply with the mandatory requirements of law in discharging their duties, compel the conclusion that this defect is fatal to the indictment.

In the case of Thiel v. Southern Pacific Company, 328 U.S. 217, 66 S.Ct. 984, 985, 90 L.Ed. 1181, the United States Supreme Court reversed a judgment of a Federal District Court in a civil action because the clerk and the jury commissioner deliberately excluded from the jury panel all persons who worked for a daily wage while at the same time they included persons who labored for pay at a weekly or monthly wage. This exclusion of laborers who were paid by the day for their work was done because of the recognized common practice of the trial judges to excuse such persons for personal hardships when they were called to serve.

In finding that the practices followed constituted reversible error in the case, the Court said:

"The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community * * This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups * * *

"Moreover, the general principles underlying proper jury selection clearly outlaw the exclusion practiced in this instance. Jury competence is not limited to those who earn [a] livelihood on other than a daily basis. One who is paid $3 a day may be as fully competent as one who is paid $30 a week or $300 a month. In other words, the pay period of a particular individual is completely irrelevant to his eligibility and capacity to serve as a juror. Wage earners, including those who are paid by the day, con-

stitute a very substantial portion of the community, a portion [which] cannot be intentionally and systematically excluded in whole or in part without doing violence to this democratic nature of the jury system * * *

"Thus a blanket exclusion of all daily wage earners, however well-intentioned and however justified by prior actions of trial judges, must be counted among those tendencies which undermine and weaken the institution of jury trial * * *

"It follows that we cannot sanction the method by which the jury panel was formed in this case. The trial court should have granted petitioner's motion to strike the panel. That conclusion requires us to reverse the judgment below in the exercise of our power of supervision over the administration of justice in the federal courts * * * On that basis it becomes unnecessary to determine whether the petitioner was in any way prejudiced by the wrongful exclusion or whether he was one of the excluded class * * *

"It is likewise immaterial that the jury which actually decided the factual issue in the case was found to contain at least five members of the laboring class. The evil lies in the admitted wholesale exclusion of a large class of wage earners in disregard of the high standards of jury selection."

In the above-cited Thiel case, the Court quoted in support of its decision portions of the opinion of the same Court in the earlier case of Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, wherein it held that it would be compelled to set aside conviction of this male defendant if he had proved his charge that the clerk and jury commissioner had excluded from the jury panel all women who were not members of the Illinois League of Women Voters since the only names of women placed in the jury box were those appearing on a list of women furnished by that organization and presumed to be limited to its membership.

Six months after its decision in the Thiel case, the Supreme Court decided Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 265, 91 L.Ed. 181, which was a criminal case arising in the Federal Courts. In that case, all women were systematically excluded from selection to the jury panel although women were eligible for jury service.

In reversing conviction of the defendants, a man and a woman, the Court reviewed the law on selection of Federal jurors and said:

"* * * But reversible error does not depend on a showing of prejudice in an individual case. The evil lies in the admitted exclusion of an eligible class or group in the community in disregard of the prescribed standards of jury selection. The systematic and intentional exclusion of women, like the exclusion of a racial group, Smith v. [State of] Texas, 311 U.S. 128 [61 S.Ct. 164, 85 L.Ed. 84], or an economic or social class, Thiel v. Southern Pacific Co., supra, deprives the jury system of the broad base it was designed by Congress to have in our democratic society. It is a departure from the statutory scheme. As well stated in United States v. Roemig [D.C.] 52 F.Supp. 857, 862, 'Such action is operative to destroy the basic democracy and classlessness of jury personnel.' It 'does not accord to the defendant the type of jury to which the law entitles him. It is an administrative denial of a right which the lawmakers have not seen fit to withhold from, but have actually guaranteed to him'. Cf. Kotteakos v. United States, 328 U.S. 750, 764–765 [66 S.Ct. 1139, 90 L.Ed. 1557]. The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.

" * * * the grand jury was likewise drawn from a panel improperly chosen and therefore the indictment was not returned in accordance with the procedure established by Congress. Accordingly, the indictment must be dismissed."

The contention that the exclusion of all eligible persons not registered to vote and all women except those who had also volunteered for jury duty did not in fact violate the rule that the jury as selected must be a fair representation of a cross section of the community, and that there was no real exclusion of a class or group, is without merit. A similar contention that the group was still adequately represented was urged by the minority of the Supreme Court in Thiel v. Southern Pacific Co., supra, and was rejected by the majority. Justice Frankfurter, one of the minority Justices, in his opinion argued:

" * * * it will hardly be contended that the absence of such daily wage earners from the jury panel removed a group who would act otherwise than workers paid by the week or the wives of the daily wage earners themselves. The exclusion of the daily wage earners does not remove a group who would, in the language of Mr. Justice Holmes, 'act otherwise than those who are drawn would act' * * * It certainly is too large an assumption on which to base judicial action that those workers who are paid by the day have a different outlook psychologically and economically than those who earn weekly wages."

And in the later case of Ballard v. United States, supra, the majority of the Court in their opinion said:

"It is said, however, that an all male panel drawn from the various groups within a community will be as truly representative as if women were included. The thought is that the factors which tend to influence the action of women are the same as those which influence the action of men—personality, background, economic status—and not sex. Yet it is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise do not act as a class. But if the shoe were on the other foot, who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel?"

Could it be said in the present case that a jury panel from which all registered voters had been intentionally excluded was truly representative of the community? This Court does not think so. It is evident that a jury panel from which all were deliberately and systematically excluded who did not register to vote, in a community where many citizens qualified for Federal jury service do not so register, and to likewise exclude all women from jury service except the very few who registered for jury service in the State Courts, is not a fair representation of the community.

■ The grand jury was drawn from a panel which was selected contrary to the requirements of law; and since it is not necessary to show prejudice affecting any of the defendants,[2] the indictment must be dismissed.

The dismissal of the indictment does not necessarily terminate the prosecution of the defendants charged. Under the provisions of Title 18, § 3288, U.S. Code, it is provided that:

"Whenever an indictment is dismissed for any error, defect or irregularity with respect to the grand jury, or is found otherwise defective or insufficient for any cause, after the period prescribed by the applicable statute of limitations has expired, a new indictment may be returned not later than the end of the next succeeding regular term of such court, following the term at which such indictment was found de-

2. Thiel v. United States, supra; Ballard v. United States, supra.

fective or insufficient, during which a grand jury shall be in session which new indictment shall not be barred by any statute of limitations. June 25, 1948, c. 645, 62 Stat. 828."

Therefore, the Government, if it so desires, can again present the matter to a properly constituted grand jury during the time specified in the said statute inasmuch as this opinion does not in any way determine the merits of the Government's charges against these defendants.

It is, therefore,

Ordered, adjudged and decreed:

That the several motions of the defendants, James R. Hoffa, Henry Lower and Robert E. McCarthy, Jr., to dismiss the indictment in this cause No. 1241 Orl.Cr., upon the grounds that the grand jury was improperly selected be, and the same are each hereby, granted, and the said indictment is hereby dismissed.