UNITED STATES of America

v.

Jacob H. GREENBERG and Morris Mac
Schwebel, Defendants (two cases).

United States District Court
S. D. New York.

Dec. 14, 1961.

Robert M. Morgenthau, U. S. Atty., New York City, for United States, Stephen E. Kaufman, Peter H. Morrison, Asst. U. S. Attys., New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant, Morris Mac Schwebel, Simon H. Rifkind, Martin Kleinbard, Arthur B. Frommer, Allan Blumstein, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

Defendant Schwebel moves under Rule 6(b), F.R.Cr.P., 18 U.S.C.A., to dismiss two indictments against him "on the grounds that the Grand Jury finding the indictments was not selected, drawn or summoned in accordance with law."

The indictments were returned on February 6, 1961 by a grand jury impaneled in December 1960. Indictment 61 Cr. 132 is in one count and charges Schwebel and a co-defendant Greenberg, who is not before the court, under 18 U.S.C. § 371 with conspiring to violate provisions of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., by the use of the mails and instrumentalities of interstate commerce in dealings in corporate securities of Basic Atomics, Inc. Indictment 61 Cr. 133 is in 62 counts. The first count charges Schwebel and Greenberg under 18 U.S.C. § 371 with conspiring to violate the same provisions of law in dealings in corporate securities of Soil Builders International Corporation. The other 61 counts charge specific violations of various provisions of the Securities Act in these dealings. A motion by Schwebel to dismiss five of these counts as time barred has been granted on consent of the Government.

The motions of defendant Schwebel directed to the selection of the grand jury returning these indictments focus on the methods used to obtain the names on the lists of qualified jurors on file in this court from which the grand jury was selected. He contends that these methods violate both statutory and constitutional requirements for selection and qualification of jurymen (28 U.S.C. § 1861, as amended by the Civil Rights Act of 1957, 71 Stat. 638; Constitution, Art. III; Amendments 6 and 7) and that therefore the grand jury drawn from such a list necessarily was illegally and improperly constituted.

After hearing argument on Schwebel's motions I directed the clerk of this court

to have a statement prepared by the deputy clerk in charge of jurors and the jury commissioner, fully describing "the manner, method and procedures used for the selection, choosing and drawing of the names on the lists of persons on file in this court from which the members of the Grand Jury returning these indictments were selected." Such a statement was filed and copies furnished to counsel for the respective parties. Thereafter, at the request of counsel for Schwebel I directed the clerk to have a supplemental statement prepared and filed furnishing additional information on this subject. The supplemental statement has been filed. Thereafter counsel for both parties were advised that final submissions would be received not later than October 18, 1961. All submissions have been received and the motions are now before me for decision on the affidavits submitted by the respective parties and the two statements filed by the clerk. There has been no request to have testimony taken.

### Procurement of qualified jurors in this district.

It is necessary in this court to maintain a large pool of qualified prospective jurors from which the very substantial number of talesmen required in the busiest district in the country may be summoned for service. The list of qualified petit and grand jurors on file contains about 20,000 names. The list constantly requires replenishment to replace prospective jurors who have died, have moved away or have become unavailable for jury duty for other reasons.

Before persons can be added to the pool of qualified jurors a preliminary examination is necessary to determine whether they meet the statutory qualifications for jury service and are able to serve. Qualification notices are continuously being sent out summoning persons for such preliminary examination.

The names of the persons to whom such qualification notices are mailed are obtained almost entirely from the lists of those registered to vote in presidential years in the counties of New York, Bronx and Westchester. These are the official lists of registered voters prepared every four years by the duly constituted Boards of Election in these counties.

In New York and Bronx Counties a list of registered voters is prepared by the Board for each assembly district. There are 16 assembly districts in New York County containing a total of 1,067 election districts, and 12 assembly districts in Bronx County with a total of 943 election districts. For each of the assembly districts the registered voters are listed by election districts. The names appear in parallel vertical columns on successive pages by street address.

To obtain the names to which jury qualification notices are to be sent a key number in the first column of one of the assembly district lists, counting down from the top or up from the bottom, is selected at random; for example, the fifth or tenth name from the top or bottom. Thereafter each fifth name in all the columns for the assembly district will be taken from column after column on page after page and jury qualification notices made out addressed to them. The same process is carried on through every assembly district list in rotation so that all of the assembly districts and all of the election districts are eventually covered. When all have been gone through another key number is selected at random and the same process is again repeated as often as is required to produce the number of names then needed. Thus the selection of prospective jurors for qualification is made, as part of a continuous process, with selections made at random from every part of the two counties.

In Westchester County the lists of those registered to vote in presidential years are prepared by wards for each city and town. The same method of selecting names of prospective jurors to whom qualification notices are sent is followed with respect to the Westchester County lists for the 12 cities and towns nearest the New York City limits comprising about 80% of the population of the County.

In 1960 the total number of registered voters in New York, Bronx and Westchester Counties was 1,758,142. In the years from 1950 through 1960, 187,024 qualification notices were sent out to persons selected in the manner described from the lists of registered voters in the three counties. The number of qualification notices sent out yearly to such persons ranged from a maximum of 27,950 in 1957 to a minimum of 8,575 in 1952.

In addition, qualification notices were sent out in some years during this period to persons whose names were obtained from telephone directories and real estate listings. These totaled 6,855, or some 3% of the notices sent out. Some qualification notices were also sent to persons whose names had been recommended for jury service as such names were received.

The notices to appear for jury qualification addressed to the persons selected by this method are placed on file in the office of the jury clerk until such time as additional names are required to be added to the list of qualified jurors. They are then mailed out to the prospective jurors. The notice requests the addressee to appear for preliminary examination on a day certain.

Those appearing who do not have a statutory exemption or disqualification, or a physical infirmity or other manifest hardship which would prevent them from serving, are required to complete a questionnaire which in all material respects conforms to the questionnaire suggested in the Report of the Judicial Conference Committee on the Operation of the Jury System, approved by the Judicial Conference of the United States, entitled, The Jury System in the Federal Courts, pp. 99–100 (1960). All those completing questionnaires who qualify are placed on the list of qualified jurors as either petit or grand jurors.

Wheel cards and history cards are made out for each person who has qualified. These cards are kept on file in the clerk's office. The wheel cards are arranged according to dates of service and time for placing in the wheel.

The grand jury wheel from which a panel of prospective grand jurors is drawn ordinarily contains between 500 and 800 wheel cards. The names in the wheel comprise qualified jurors (a) taken from the list of those whose last service was more than two years ago, (b) who were called for service and excused three months before, (c) who have been marked for service in the particular month by a judge hearing excuses, and (d) who qualified for service in the preceding month. From this wheel a panel of 75 names is drawn to be placed in the wheel from which the grand jury is ultimately selected.

The panel from which the grand jury returning these indictments was drawn was selected from the wheel on September 30, 1960. The wheel from which the panel was drawn contained 490 cards remaining from the previous drawing. The jury clerk and the jury commissioner each alternately added 25 cards selected from the list, making a total of 540 cards in the wheel. When a panel of 75 had been drawn notices were sent to the talesmen on the panel to appear for the drawing of the grand jury on December 6, 1960. On that day the 75 names on the panel were placed in the wheel and the 23 names were drawn from the wheel and sworn in to comprise the grand jury which returned these indictments.

The jury clerk and the jury commissioner both state unequivocally that at no time has there ever been any attempt to exclude from petit or grand jury service any qualified individual, class or group.

Defendant's challenge to the method of procuring qualified jurors.

Schwebel's challenge to this grand jury is based in the first instance on the fact that the list of qualified jurors on file in this court from which it was selected was taken almost entirely from the voter registration lists. He does not attack the procedures by which the grand jury was drawn from that list.

According to the figures on which defendant relies, derived from the 1960

census, there were 2,528,152 citizens over the age of 21 in the counties of New York, Bronx and Westchester in 1960.[1] There were 1,758,142 persons registered to vote in the three counties in that same year. Defendant therefore calculates that only some 70% of the adult citizen population prospectively eligible for jury duty was canvassed to obtain qualified jurors, and that approximately 30% of such population was not canvassed at all.

This method of obtaining qualified jurors, he contends, results in the systematic exclusion from consideration of the 30% of the adult citizen population which does not register to vote. Relying chiefly on the recent decision in United States v. Hoffa, 196 F.Supp. 25 (S.D.Fla., 1961), it is his position that "while it may be proper to use voting lists as one of the sources for the selection of grand jurors, it is improper to restrict and confine such selection to such lists, in systematic exclusion of non-registered adult citizens." He contends that non-registered adult citizens are a cognizable group or class which he calls the "politically dormant," and that the result of the exclusion of such a class or group is "to insure that the juries of this district will not constitute a representative cross-section of the community" in violation of both constitutional and statutory standards for federal jury selection.

Defendant makes the further contention that this method results in the selection for jury service of a disproportionate number of persons of "higher" income. In support of this contention he quotes statements by sociologists and students of the electoral process to the general effect that persons of low income fail to exercise the franchise to a greater extent than those of higher income. This factor, he says, also contributes to the claimed non-representative character of Southern District juries.

This is further compounded, he says, by the use of telephone directories and real estate listings to obtain some 3% of the names to whom jury qualification notices were sent out, since it is likely that these sources will produce more persons of higher than lower income.

Quite apart from this, he urges that the virtually exclusive use of voter registration lists as a source of prospective jurors violates the Civil Rights Act of 1957 as it amended 28 U.S.C. § 1861, 71 Stat. 638.

I.

The main thrust of defendant's challenge is based on the proposition stated in Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946), that

"The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. Smith v. Texas, 311 U.S. 128, 130, [61 S.Ct. 164, 165, 85 L.Ed. 84] Glasser v. United States, 315 U.S. 60, 85 [62 S.Ct. 457, 471, 86 L.Ed. 680]. This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury."

[1]. This figure represents the 1960 census total of 2,749,702 adults residing in the three counties, less 221,550 registered aliens in these counties in 1958, the last year in which the number of aliens was tabulated on a county basis.

■ The power of the federal courts to insure that these standards are applied derives from their supervisory powers over the administration of federal justice. Thiel v. Southern Pacific Co., supra; Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946). See, also, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941), and Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947).

■ This power extends beyond the limits of constitutional requirements guaranteeing trial by jury and traditional concepts of due process. It includes, and, indeed, goes beyond specific statutory requirements. The systematic exclusion of a racial group or economic or social class from jury service

> "deprives the jury system of the broad base it was designed by Congress to have in our democratic society. It is a departure from the statutory scheme. As well stated in United States v. Roemig, [D.C.] 52 F.Supp. 857, 862, 'Such action is operative to destroy the basic democracy and classlessness of jury personnel.' It 'does not accord to the defendant the type of jury to which the law entitles him. It is an administrative denial of a right which the lawmakers have not seen fit to withhold from, but have actually guaranteed to him.' Cf. Kotteakos v. United States, 328 U.S. 750, (764–765) [66 S.Ct. 1239, 90 L.Ed. 1557]. The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." Ballard v. United States, supra, 329 U.S. p. 195, 67 S.Ct. p. 265.

Thus we need not consider separately the constitutional grounds of challenge asserted generally by the defendant since the standards which the court must apply in exercising its supervisory powers necessarily include and go beyond constitutional requirements. Thiel v. Southern Pacific Co., supra; Ballard v. United States, supra; Fay v. New York, supra; McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1942).

■ The defendant here does not claim that any actual or specific prejudice to him has resulted or will result from the methods of selection which he attacks. But his right to relief is not dependent upon a showing of prejudice in his individual case. If, as he claims, the list from which this grand jury was drawn was made up in violation of prescribed and accepted standards then that in itself would entitle him to relief.[2]

■ However, a party making the challenge has the burden of showing that the required and accepted standards for jury selection have been violated. He must introduce or offer "distinct evidence" in support of his challenge. His failure to do so is fatal. Glasser v. United States, supra; Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1948); United States v. Carrion, 140 F.Supp. 226 (D.P.R.1956). The question here is whether defendant Schwebel has sustained that burden.

Since the amendment of 28 U.S.C. § 1861 by the Civil Rights Act of 1957 the qualifications and exemptions of federal jurors are no longer determined by the laws of the state in which the federal court has its seat. The qualifications for jurors in the federal courts are laid down in § 1861 which reads:

> "Any citizen of the United States who has attained the age of twenty-

2. This is in contrast to the requirements for raising a federal constitutional question upon challenge to a jury selected in the state courts. There the challenge is based solely on the equal protection and due process clauses of the Fourteenth Amendment and a showing of actual prejudice is required. See, e. g., Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1879); Carter v. State of Texas, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839 (1900); Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Eubanks v. State of Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958).

one years and who has resided for a period of one year within the judicial district, is competent to serve as a grand or petit juror unless—

"(1) He has been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.

"(2) He is unable to read, write, speak, and understand the English language.

"(3) He is incapable, by reason of mental or physical infirmities to render efficient jury service."

Citizens cannot be excluded from jury service "on account of race or color." 28 U.S.C. § 1863. Members of the armed services, firemen and policemen and public officers are exempted from service. 28 U.S.C. § 1862.

In addition jurors must be returned from such parts of the district as the court may direct "so as to be most favorable to an impartial trial, and not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service." 28 U.S.C. § 1865.

■ Congress has not chosen to establish any uniform system of selecting the array of qualified jurors from which grand or petit juries are to be drawn. There is no prescribed method of selection. Congress has established uniform qualifications for individual jurors but it has left to each district the adoption of suitable methods to obtain the necessary talesmen. Within the framework of the pertinent statutory provisions "the choice of the means by which unlawful distinctions and discriminations are to be avoided rests largely in the sound discretion of the trial courts and their officers." Thiel v. Southern Pacific Co., supra, 328 U.S. p. 220, 66 S.Ct. p. 986.[3]

The task of providing the large number of qualified jurors required in this heavily burdened court in a great metropolitan area is not without its difficulties. The objective is to obtain a pool of jurors "drawn from every economic and social group of the community without regard to race, color or politics" and possessing "as high a degree of intelligence, morality, integrity, and common sense, as can be found by the persons charged with the duty of making the selection." [4]

The administrative problem remains and the choice of sources from which the names of prospective jurors are to be selected lies in the hands of the clerk and jury commissioner acting under the direction of the District Court. No perfect system to accomplish these results has yet been devised. There is no mathematical formula by which to determine what would constitute a completely representative cross-section of the community of some 4,700,000 people comprising the Southern District of New York. The

---

3. The Report of Judicial Conference Committee on the Operation of the Jury System, op. cit. supra, recommends: "The choice of specific sources from which names of prospective jurors are selected must be entrusted to the clerk and jury commissioner, acting under the direction of the district judge, but should be controlled by the following considerations: (1) the sources should be coordinated to include all groups in the community; (2) economic and social status including race and color should be considered for the sole purpose of preventing discrimination or quota selection; (3) women are now eligible by law for jury service in federal courts and they should be selected and called to serve without discrimination on account of sex; (4) political affiliation should be ignored; (5) generally speaking, unsolicited requests of persons who seek to have their names placed upon jury lists should be denied and unsolicited recommendations of names should not be recognized; and, (6) in determining the parts of the district from which jurors are to be drawn, the courts should bear in mind the desirability of conserving the time of jurors and preventing exorbitant travel expense to the government." (p. 13).

4. Knox Committee Report of 1942 at p. 13, as quoted at p. 17 in the Report of the Judicial Conference Committee on the Operation of the Jury System, op. cit. supra.

principal population of this community resides in the New York metropolitan area where every conceivable race, creed, color and political and social and economic background are represented. The ascertainment of what would constitute a completely representative cross-section of such a community is perhaps as elusive as the ascertainment of what is the ideal reasonable man so familiar to the law. All that is expected of the jury officials charged with the duty of providing a pool of qualified jurors is that the methods of selection used are reasonably designed to produce a representative cross-section of the community in the light of the practical means available. Dow v. Carnegie-Illinois Steel Corp., 224 F.2d 414 (3 Cir., 1955), cert. den. 350 U.S. 971, 76 S.Ct. 442, 100 L.Ed. 842; United States v. Flynn, 216 F.2d 354 (2 Cir., 1954), cert. den. 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713; United States v. Dennis, 183 F.2d 201 (2 Cir., 1950), cert. den. 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; United States v. Local 36 of International Fishermen, 70 F.Supp. 782 (S. D.Cal.1947), aff'd 9 Cir., 177 F.2d 320, cert. den. 339 U.S. 947, 70 S.Ct. 801, 94 L.Ed. 1361.

■ A party does not have a vested right in any particular method of selection. "Neither statutory nor case-made law requires the use of any particular source of names so long as there is no systematic exclusion of the members of any race, creed, social or economic group." Padgett v. Buxton-Smith Mercantile Co., 283 F.2d 597, 598 (10 Cir. 1960), cert. den. 365 U.S. 828, 81 S.Ct. 713, 5 L.Ed. 2d 705. There is no cause to complain as long as the methods employed are reasonably designed to reach a fair cross-section. United States v. Flynn, supra. The burden on a party challenging the method of selection is to show that the methods used were not reasonably designed to produce such a result.

■ In the case at bar defendant Schwebel has wholly failed to sustain the burden of showing that the primary reliance in this district on the lists of registered voters as a source of prospective jurors is not reasonably designed to produce a fair cross-section of the community.

It is significant that qualifications for federal jury service bear a striking similarity to the requirements for voter registration in the State of New York. 28 U.S.C. § 1861 provides that a citizen who has attained the age of 21 and has resided within the district for one year is qualified unless he has been convicted of a felony in a state or federal court and his civil rights have not been restored, is unable to read, write, speak and understand the English language or is incapable by reason of mental or physical infirmities of rendering efficient jury service.

Section 150 of the New York Election Law requires a voter to be a citizen over 21 years of age who has been an inhabitant of the state for one year next preceding the election, for 4 months a resident of the county, and for the last 30 days a resident of the election district. He must be able, except for physical disability to read and write English. Persons who have been convicted of a felony and have not been restored to rights of citizenship or who accept or give bribes to influence votes are excluded from voting. New York Election Law, McKinneys Consol.Laws, c. 17, § 152.

On the figures on which the moving defendant relies the total adult citizen population of the Counties of New York, Bronx and Westchester was 2,528,152 in 1960. The number of persons registered to vote in the 1960 election in these three counties was 1,758,142. Thus, approximately 70% of the adult citizen population is included in the registration lists from which prospective jurors were obtained. There is not the slightest implication that in New York any persons qualified to vote are excluded from registering. Nor is there any implication that the selections made by the jury officials of this district from this very large majority of those who might conceivably be eligible for federal jury service were not completely fair and at random. In-

deed, far from attempting to exclude any economic, social, religious, racial, political or geographic group in selecting names from the voting lists, the record shows that every effort was made not to do so. The selections were completely at random and covered every election district in every assembly district of the area. Thus, the very large majority of those conceivably eligible for federal jury service have been thoroughly and objectively canvassed.

Moreover, though 30% of those not registered to vote are uncanvassed it does not follow that all 30% are eligible for federal jury service. The unregistered 30% must necessarily include an indeterminate number of persons who were not qualified for federal jury service under the statute.

For example, persons are excluded from jury service who are "unable to read, write, speak, and understand the English language." Those unable, except for physical disability to read and write English are excluded from registration as voters. Such persons are excluded *both* from federal jury service and from voter registration.

There is no proof before me as to how large this group is. But common experience in this city indicates that even among the citizen population the number of those who cannot read and write English may be not insubstantial. One example is the substantial Spanish speaking population in New York and Bronx Counties. See Matter of the Application of Camacho v. Rogers, D.C., 199 F.Supp. 155.

Moreover, the 30% not registered to vote includes those who have not resided for one year in the state. Persons in this category would not have resided for one year in the judicial district, as required for federal jury service. Thus, an indeterminate number of citizens who are ineligible for jury service because of lack of required residence are also excluded from registering to vote.

Urban population is highly mobile. Indeed, as was pointed out by Judge Learned Hand in United States v. Dennis, supra, 183 F.2d p. 219, " * * * the Census shows that less than one-half the urban population lives in the same quarters for seven years * * *." There is no indication that mobility has lessened.

The number of persons who cannot register to vote and who would also be unqualified or unavailable for federal jury service is multiplied when the aged and infirm, the mentally deficient, the persons confined in institutions and the convicted felons are taken into account.

In short, the number of persons not qualified for jury service who are included within the 30% of adult citizens not registered to vote is not insubstantial and considerably more than 70% of those qualified are reached by the use of the registration lists. The challenging defendant has not enlightened the court as to how high the percentages actually go.

The defendant suggests that methods "could certainly be perfected on a scientific basis" to provide a better representative cross-section of the community. He suggests "the use of city directories," and "the use of a variety of lists (including those furnished by labor unions)." No doubt a city directory would be a helpful adjunct to the jury officials in this district. But no city directory has been published since 1933. Quite apart from the dangers inherent in selection from lists provided by private groups with special interests, Glasser v. United States, supra, it was noted by Judge Hand in the Dennis case as long ago as 1947 that when a labor union was asked for a list of prospective jurors "their people wanted nothing to do with juries." (183 F.2d p. 222). The court in Dow v. Carnegie-Illinois Steel Corp., supra, also referred to "the meager result of soliciting names from unions." (224 F.2d p. 426). Defendant's suggestions are scarcely practical.

Nor are census lists of any practical help. Even assuming that the Secretary of Commerce was not precluded from making public information relating to

and identifying individuals (13 U.S.C. § 9) and that lists of persons in usable form were available from the Census Bureau, such lists would be of little aid in this process of selection. The unreliability of lists prepared once every ten years relating to highly mobile urban populations is obvious. Short of an annual census designed to elicit information relevant to juror qualifications or a required population registration, either of which would require a staff and expenditures out of all proportion to the results obtained, the registration lists as used in this district offer the most comprehensive source of available jurors. Cf. Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 97 L.Ed. 469 (1953); United States v. Local 36 of International Fishermen, supra. A scientifically perfect system of producing a representative cross-section of the community is not required and no such system has been devised. "Arguments can be made against the use of any list, as none are available for the whole population." United States v. Local 36 of International Fishermen, supra, 70 F.Supp. p. 799. All that is required is to use methods reasonably designed to produce a jury representative of a cross-section of the community. The objective selection of names at random from registration lists as they are maintained in this community fully satisfies this requirement and commends itself to an impartial jury system.

In the light of what has been said there can be no valid challenge of a process which covers such a very large percentage of those who would be eligible for jury service, nor any claim that such an objective canvass would not produce a representative cross-section of the community unless it be shown that such a process necessarily resulted in the exclusion from service of a cognizable group or class of citizens. Here the defendant claims that non-voters by the mere fact of failing to vote constitute such a group or class and that their exclusion from consideration invalidates the selective process. He characterizes this group as "the politically dormant" and says that their common failure to vote is a cohesive factor which binds all of them together in a community of interest. There is no merit to this contention. Defendant has failed to show that those who do not register can be classed in any particular economic, social, religious, racial, political or geographical group of the community. On the contrary, they include all of such groups. Nor has defendant shown there is any fixed composition or thread which binds those in this category into a cohesive group. See Young v. United States, 94 U.S.App.D.C. 54, 212 F.2d 236 (1954), cert. den. 347 U.S. 1015, 74 S.Ct. 870, 98 L.Ed. 1137; United States v. Carrion, supra. All that such persons have in common is their failure to exercise the right of franchise at a given election. They are united only in disinterest.

The grouping shifts from election to election. The single thread of failure to vote has no permanence. Those registered to vote in one presidential election may well not be registered in another, and vice versa. See New York Election Law, § 352. There is nothing to show that they are of any particular shade of opinion. There is no indication that the failure to canvass such persons defeats in any way the concept of an array from which impartial representative juries may be selected.

In addition, defendant claims that there is a higher proportion of lower income persons among non-voters than among those who exercise the franchise. He therefore argues that the failure to canvass non-voters results in an array selected from the registration lists which has an undue proportion of those of higher income.

The material which he relies on to support this contention consists of statements by sociologists and students of the electoral process to the effect that it is generally true that more persons of lower income than higher income fail to vote. This material is presented in affidavits of counsel and consists of purely

hearsay statements which do not rise to the dignity of formal proof. See Glasser v. United States, supra; Frazier v. United States, supra. It rests upon the most slender foundations. There is no showing as to how these conclusions are arrived at or any discussion of the nature or reliability of the studies on which they are alleged to rest. It has not been demonstrated that the persons to whom these statements are ascribed are qualified as experts in the evidentiary sense.

But even were the conclusions accepted at their face value they do not establish that the method of selection used violated any accepted or required standards. There is no definition of what the so-called low income or high income groups consist of. The only figures given are to the effect that the percentage of persons who do not vote range from 38% with incomes less than $2,000 to 16% with incomes of over $5,000. There is nothing before me as to what sampling was taken in order to arrive at these figures or to what geographical areas they apply. In any event, however, all that such figures indicate is that there is a substantial representation of all income groups among the voting population.[5]

Other "studies" referred to indicate that persons less likely to vote include not only those of lower economic groups but also women, those who have had less education, those who are younger, those who are newcomers to the community and those of certain faiths. Defendant's materials only succeed in showing the wide diversity which runs through both voter and non-voter categories.

■ In reality defendant would have me hold that a system of proportional representation should be devised for the procuring of prospective jurors. The courts have repeatedly rejected such a concept and I reject it here. As the Court of Appeals of this circuit pointed out in United States v. Flynn, supra, the concept of proportional representation "has never been a part of the Anglo-American jury system and, indeed, is repugnant to that system." It declined "to use our power of supervision to create a system of proportional representation on federal juries, even were such a goal attainable." (216 F.2d p. 388). See United States v. Dennis, supra; Dow v. Carnegie-Illinois Steel Corp., supra; Padgett v. Buxton-Smith Mercantile Co., supra; United States v. Local 36 of International Fishermen, supra; United States v. Carrion, supra.

The array under challenge here was drawn from the large majority of those who were eligible for jury service, a majority which contained representatives of every class or group in the community. The method of selection under attack is calculated to produce a much more representative cross-section than the system upheld in such cases involving challenge to federal jury selection as United States v. Dennis, supra; United States v. Flynn, supra; Dow v. Carnegie-Illinois Steel Corp., supra; Young v. United States, supra; United States v. Carrion, supra, to name only a few, and in such cases arising under the equal protection and due process clause as Fay v. New York, supra; Brown v. Allen, supra; Hoyt v. Florida, 82 S.Ct. 159 (decided November 20, 1961).

The two cases on which the defendant primarily relies, Thiel v. Southern Pacific Co., supra, and Ballard v. United States, supra, are in no way comparable to the case at bar.

---

5. Defendant urges that the home addresses of the members of the grand jury which returned these indictments indicate that they come from "high income" areas or communities and that it therefore should be inferred that the method of selection employed does not produce representative grand juries. The inference that all jurors who live in these areas are necessarily from a "high income" group is unsupported. But even if they were this is irrelevant to the issues raised on this motion. An entirely proper method of jury selection may produce a given jury quite unrepresentative of the community, just as improper methods of selection may result in an entirely representative jury. See Dow v. Carnegie-Illinois Steel Corp.; supra, 224 F.2d p. 422.

In the Thiel case the judgment was reversed because daily wage earners were deliberately excluded by the jury officials selecting the array. In Ballard the conviction was reversed because women were systematically excluded. In both cases the exclusion was of a cohesive class, united by common interests, and the resulting arrays, therefore, were not representative of the communities from which they were drawn. None of the six groups, economic, social, religious, racial, political and geographical, which were listed in the Thiel case as non-excludable, have been excluded here. Non-voters come from both sexes and from all economic, social, racial, religious, political and geographical groups. They comprise no cohesive group and their exclusion does not threaten the representative character of jury panels. Neither the Ballard nor the Thiel cases are applicable.

■ One thing remains to be mentioned on this phase of the case. Defendant, who at the outset of his motions urged that the method of selection was invalid because it was confined to registration lists, now urges that the process of selection is invalid because somewhat over 3% of qualification notices were sent over a period of ten years to prospective jurors whose names were selected from telephone directories and real estate listings. It is unnecessary to comment on this argument except to say that this small proportion could not possibly affect the representative character of the panel selected, even had anything definitive been shown as to characteristics of persons whose names appeared in these sources.

I therefore find that the methods employed in this district to select the persons on the list of qualified jurors from which this grand jury was drawn were reasonably designed to reach a representative cross-section of the community and there was no systematic exclusion of any cognizable group or class of qualified citizens from jury service. The system used was a fair and reasonable system which in its operation can be expected to result in the selection of adequate and proper grand juries.

## II.

■ Defendant also contends that, regardless of the considerations just discussed, the exclusive use of registration lists as a source of prospective jurors violates 28 U.S.C. § 1861 as amended by the Civil Rights Act of 1957, 71 Stat. 638, and that therefore his challenge must be sustained. He relies primarily on United States v. Hoffa, supra, recently decided in the United States District Court for the Southern District of Florida. It is defendant's position that United States v. Hoffa holds squarely that the exclusive use of voter or registration lists is forbidden by the 1957 Amendment.

The Hoffa case deals with circumstances in the Orlando Division of the Southern District of Florida which are quite different from those in the Southern District of New York. It does not hold that the exclusive use of voting or registration lists is forbidden by the 1957 Amendment under appropriate circumstances.

There is nothing in the language of § 1861 as written which can be construed to forbid the use of voter registration lists.

The defendant nevertheless contends that when the 1957 Amendment is read in the light of its legislative history it must be construed to forbid their exclusive use in order to carry out the purpose and intent of Congress. I find no support in the legislative history for this contention.

Prior to the enactment of the Civil Rights Act of 1957, Section 1861, in addition to practically the same qualifications for federal jury service as at present, provided that no person was qualified to serve as a federal juror unless "he [was] competent to serve as a grand or petit juror by the law of the State in which the district court is held." [6]

6. Prior to 1957 this section merely required that the prospective juror reside in the district. The 1957 amendment changed this requirement to a minimum of one year residence in the district.

In 1941 "there were 48 different sets of qualifications and 68 general classes of possible grounds of exemption throughout the various states. Women were not qualified to serve as jurors in 18 states * * *." Report of the Judicial Conference Committee, op. cit. supra, p. 35.[7] As a result of the 1957 amendment not only were the requirements made uniform throughout the federal judicial system but "[l]arge groups of intelligent, qualified citizens, including women and professional people, previously unavailable by reason of disqualification or exemption under state law have been rendered eligible for federal jury service." Id. at p. 17.

The Civil Rights Act of 1957 was of broad scope and provided for the establishment of the Commission on Civil Rights, for an additional assistant attorney general to assist in civil rights matters, for the strengthening of civil rights statutes, for means of further securing and protecting the right to vote, and for trial by jury in proceedings to punish criminal contempts growing out of civil rights cases. The amendment of § 1861 dealing with qualifications of federal jurors was contained in the last section of the Act and was incidental to its main purposes.

The most controversial feature of the Civil Rights Act as originally proposed was the provision that would have done away with jury trials in contempt proceedings for failure to comply with federal court orders which arise out of civil rights cases.

This provision became so highly controversial and aroused such bitter opposition in the Senate that it threatened passage of the entire bill. In an attempt at compromise and to smooth the way for passage of the legislation, Senator O'Mahoney offered an amendment providing for trial by jury in criminal contempt proceedings arising out of civil

rights cases. 103 Cong.Rec. 11003, et seq. (1957). This amendment was opposed by a number of those backing the original bill on the ground that it emasculated the powers of the federal courts to enforce provisions concerning the right to vote. They pointed out that in various southern states negroes were excluded from jury service under state law and thus would also be excluded from federal juries under the conformity clause of § 1861, and that it would be difficult if not impossible to secure convictions in civil rights contempt cases before southern juries so constituted. See remarks of Senator Javits, 103 Cong.Rec. 11566 to 11568 (1957). A heated debate on the original provision of the bill and the O'Mahoney amendment continued spasmodically for weeks. Finally, on July 31, 1957 Senator Church proposed an amendment to the O'Mahoney amendment by which the conformity clause of § 1861 would be deleted from the section entirely. He stated the purpose of the amendment to be as follows:

"Mr. President, the amendment is designed to eliminate whatever basis there may be for the charge that the efficacy of trial by jury in the Federal courts is weakened by the fact that, in some areas, colored citizens, because of the operation of State laws, are prevented from serving as jurors. Thus the argument has been made that no jury trial should be permitted in civil rights cases, even in a proceeding for criminal contempt, because such cases concern relationships between the races, and in the South they would be tried by an all-white jury.

"Mr. President, the cases which will be brought under any civil-rights bill will be prosecuted in Federal courts. *There is no reason why Congress should not modify Federal law so as to safeguard against discrimination on the basis of race,*

---

7. "Accountants and actuaries were relieved of jury service in Alabama and Florida; chiropodists in California, Missouri and Rhode Island; linotype operators in North Carolina; and professional gamblers in Colorado and Mississippi." Report of Judicial Conference Committee, op. cit. supra, note 43.

*color, or creed, in the selection of jurors who are to serve in Federal courts.*

"We believe the amendment we have now incorporated in the Record will accomplish at least three important and long overdue objectives:

"First. It will establish reasonable and uniform qualifications for jurors serving in Federal courts, eliminating the 48 different sets of qualifications which now obtain. This is in complete accord with the generally accepted principle that Federal rules should govern Federal practice.

"Second. It will place the selection of jurors entirely in the hands of the Federal courts, thus avoiding practices under State law that, in effect, may systematically exclude citizens from jury duty in Federal courts on account of race or color.

"Third. Through the accomplishment of the above two objectives, it will confer another civil right—the right to serve as a juror—on a large segment of colored citizens, who now, in practice, may be prevented from doing so.

"Mr. President, we believe the amendment constitutes a great step forward in the field of civil rights. We believe also that it can contribute significantly in forwarding the cause to which most of us are dedicated— the cause of enacting a civil-rights bill in this Session of the Congress." (Emphasis added). 103 Cong.Rec. 13154 (1957).

A number of other Senators, speaking in support of the Church amendment, presented the same arguments. See, e. g., Senator Kefauver, id. at p. 13154; Senator O'Mahoney, id. at p. 13156; Senator Case, ibid.

Nowhere in the debates was there any indication that Congress intended to prescribe methods by which jury officials should select qualified jurors in the federal courts. Nor was there any hint that the use of state voter registration lists, exclusively or otherwise, should be forbidden. The discussion as to voting lists was directed entirely at the elimination from federal jury requirements of state qualifications based on state laws which excluded negroes from voting.

Plainly had Congress intended either to prescribe the specific methods to be used by federal jury officials to obtain qualified jurors or to proscribe the use of particular methods, it would have said so in so many words. It not only failed to do so but there is no indication that it had any such intent.

Defendant claims that Congress intended the 1957 Amendment to § 1861 to have "collateral benefits" and that these must be taken to have forbidden the exclusive use of state voter registration lists as a source of federal jurors. Though Senator Kennedy used the term "collateral benefits" at one point during the course of the debates, id. at p. 13306, his remarks do not even hint at the meaning for which defendant contends.

There is no indication that Congress intended to establish uniform methods of selecting qualified jurors or to forbid the use of any method reasonably calculated to produce a representative cross-section of the community. Indeed, as the Judicial Conference Committee stated only last year (Op. cit. supra, at pp. 25–26):

"It still does not seem feasible or desirable to draft detailed regulations to cover the preparation of jury lists throughout the United States, considering the great diversity of local, economic and social conditions found in the several districts."

The test is not whether voter registration lists are used, exclusively or otherwise, as a source of qualified jurors. The test is whether or not the use of such lists results in an array which is a representative cross-section of the community or from which a cognizable group or class of qualified citizens is systematically excluded under the doctrine of the Thiel, Ballard and Glasser cases.

United States v. Hoffa is an illustration. There, in three of the four counties involved (Orange, Osceola and Brevard) the names taken by the jury commissioner and the deputy clerk were supplied solely from lists of jurors who had been selected for service in the state courts. The federal jury officials took names given them by state officials without exercising independent selection of their own. In the case of women selections were thus limited to the small number who had volunteered for jury service in the state court. In the other county selections were limited to the relatively low percentage of the population which registered to vote.

The court found that "the percentage of qualified citizens deliberately excluded from serving on the jury was extremely high" (United States v. Hoffa, supra, 196 F.Supp. p. 29) and that all women were systematically excluded from jury service except the very few who registered for jury service in the state courts. It held that the resulting array was not a fair representation of the community and that moreover the jury officials had not exercised their own discretion in selecting a large part of the array. It was for these reasons that the challenge to the array was sustained and the indictment dismissed.

In this district, as I have pointed out, the facts and circumstances are entirely different. The use of the voter registration lists and the procedures followed by the jury commissioner and the deputy clerk in selecting names from them was reasonably designed to produce an array which was a representative cross-section of the community and no group or class was systematically excluded. The methods used in this district are in accordance with accepted and required standards of jury selection and in conformity with law. They are calculated to produce fair, impartial and adequate grand and petit juries.

The defendant's challenge to the grand jury array is therefore without merit and his motions to dismiss the indictments upon the ground that the grand jury returning them was not selected, drawn or summoned in accordance with law is in all respects denied.

It is so ordered.