**The UNITED STATES of America**

**v.**

**Salvador ANZELMO, Jack P. F. Gremillion, Ernest A. Bartlett, Joseph H. Kavanaugh, Charles H. Ritchey.**

**Crim. A. No. 31585.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Oct. 29, 1970.

Gerald J. Gallinghouse, U. S. Atty., Julian R. Murray, Asst. U. S. Atty., New Orleans, La., Edward J. Barnes, U. S. Dept. of Justice, Washington, D. C., for the United States.

Walter F. Gemeinhardt, New Orleans, La., for Salvador Anzelmo.

H. Alva Brumfield, Baton Rouge, La., Camille F. Gravel, Sr., Gravel, Roy

& Burnes, Alexandria, La., for Jack P. F. Gremillion.

Sam Sexton, Jr., Sexton & Wiggins, Fort Smith, Ark., for Ernest A. Bartlett.

Leon D. Hubert, Jr., Edward M. Baldwin, Baldwin & Merhige, New Orleans, La., for Joseph H. Kavanaugh.

Russell J. Schonekas, Tucker & Schonekas, New Orleans, La., for Charles H. Ritchey.

HEEBE, District Judge:

These five defendants were jointly charged in a 25-page indictment with one conspiracy count and 15 substantive counts for violations of the Securities Act of 1933 (hereafter SEC laws) and mail fraud statutes. They have filed numerous motions, which the Court, instead of treating separately, has grouped into generic categories. The motions, except to the extent expressly granted, are hereby denied.

## I. ALLEGED DEFECTS INVOLVING THE GRAND JURY

### A. *Grand jury array.*

The defendants attack the grand jury array on various grounds, none of which hold any merit.

In the summer of 1968 an investigative grand jury was convened in the Eastern District of Louisiana in New Orleans, to hear testimony regarding possible violations of Federal Criminal laws which occurred in the operation of Louisiana Loan and Thrift (hereafter LL&T). This investigative grand jury met periodically until December 1968. On December 23, 1968, a new jury selection act, Public Law 90–274 (28 U.S.C. §§ 1861–1869) went into effect instituting new procedures for the selection of grand and petit juries. In order to comply with the new jury selection law, a second grand jury was impanelled in January 1969. It was this second grand jury which returned the instant indictment on February 14, 1969.

This second grand jury, impanelled in January 1969, was selected in accordance with the plan for random selection of grand and petit jurors adopted by unanimous consent of the judges of the United States District Courts of the Eastern District of Louisiana and approved by the reviewing panel of the Fifth Circuit on September 10, 1968. This plan was adopted and approved pursuant to 28 U.S.C. § 1863(a) which provides that "Each United States District Court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objective of sections 1861 and 1862 of this title, and that shall otherwise comply with the provisions of this title."

■ One of two objections the defense raises is that the grand jury array was selected from only five of the thirteen parishes constituting the New Orleans Division, where the five included parishes are representative of a metropolitan area and the eight excluded parishes are representative of a rural area. This was the situation prior to January 1969, but not so any longer. Under the new random selection plan, prospective juror names are taken from all parishes for each division.

The second objection to the grand jury array is that the second grand jury, impanelled in January 1969 was randomly selected from names drawn from the voter registration lists of every parish in both the New Orleans and Baton Rouge divisions of this district, thereby intentionally excluding all otherwise qualified persons who are not registered to vote. United States v. Hoffa, 196 F. Supp. 25 (S.D.Fla.1961) is cited for the proposition that " * * * a jury panel from which all were deliberately and systematically excluded who did not register to vote, in a community where many citizens qualified for Federal jury service do not so register * * * is not a fair representation of the community." At 31.

But *Hoffa* was an unusual case, limited to its facts, generally repudiated by subsequent cases, and legislatively put to rest by the Jury Selection and Service

Act of 1968. In *Hoffa*, the jury commissioner and deputy clerk deliberately excluded from jury service an extremely high percentage of eligible jurors. Only those women who had volunteered for jury service in the state were considered; and in three counties in the district, only those male and female jurors previously selected for jury duty in state courts were considered for federal juries.

In Chance v. United States, 322 F.2d 201 (5th Cir. 1963), reh. den. 331 F.2d 473 (5th Cir. 1964), cert. den. 379 U.S. 823, 85 S.Ct. 47, 13 L.Ed.2d 34, the court restricted *Hoffa* to its facts, and refused to condemn the use of voter registration lists. The law is well summarized in United States v. Kelly, 349 F.2d 720 (2d Cir. 1965), at 778:

> "The first contention that the use of voter registration lists as the primary source of names of prospective jurors is improper under the Civil Rights Act of 1957, runs head on into the contrary authority of United States v. Greenberg [S.D.N.Y.1961], 200 F. Supp. 382; United States v. Agueci [2d Cir. 1962], 310 F.2d 817, 833–834; Gorin v. United States, 1 Cir., 1963, 313 F.2d 641, 643–644, cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052; Chance v. United States, 5 Cir., 1963, 322 F.2d 201, 202–205, rehearing denied, 5 Cir., 1964, 331 F. 2d 473, cert. denied, 379 U.S. 823, 85 S.Ct. 47, 13 L.Ed.2d 34; United States v. Kenner, S.D.N.Y., 1965, 36 F.R.D. 391. Suffice it to say that these cases make it palpably clear that the persons who are not registered to vote do not constitute 'any identifiable group in the community which may be the subject of prejudice.' Swain v. State of Alabama, 1965, 380 U.S. 202, 205, 85 S.Ct. 824, 13 L.Ed.2d 759."

The Jury Selection and Service Act of 1968, Public Law 90–274, 28 U.S.C. § 1863(b) (2) provides the fundamental requirement that voter lists be used as the basic source of juror names. 28 U.S.C. § 1863, Plan for Random Jury Selection, provides in subsection b

> "Among other things, such plan shall—
> * * *
> "(2) specify whether the names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division. The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title."

The judges of this district, following the literal language and clear intent of the statute, concluded "(v)oter registration lists, including any and all federal registrars' lists, represent a fair cross section of the community * * * [and since] the rights of all citizens are substantially protected by the use of such lists as the source of selection of prospective jurors, * * * no other source is proposed." (Plan for Random Selection)

The legislative history as reflected in House Report No. 1076, which substantially adopted Senate Report 891 on Senate Bill 989 states:

> "S. 989, as amended, embodies two important general principles: (1) random selection of juror names from the voter lists of the district or division in which court is held; and (2) * * *." (U. S. Code Congressional and Administrative News, 1968, p. 1793)

It further goes on to state:

> "The bill specifies that voter lists be used as the basic source of juror names. These lists provide the widest community cross section of any list readily available." *Id.* at 1794.

■ Congress had both anticipated and rejected the argument that the selection of juries from voter lists would not produce a cross section of the community and would discriminate against nonvoters.

> "In a sense the use of voter lists as the basic source of juror names dis-

criminates against those who have the requisite qualifications for jury service but who do not register or vote. This is not unfair, however, because anyone with minimal qualifications— qualifications that are relevant to jury service—can cause his name to be placed on the lists simply by registering or voting. No economic or social characteristics prevent one who wants to be considered for jury service from having his name placed in the pool from which jurors are selected." H. Rept. 1087, U. S. Code Cong. and Adm. News 1968, pp. 1794–1795.

### B. *Grand jury misinformed.*

The defendants allege that the grand jury was not advised sufficiently of the applicable laws relating to the subject under investigation so that regardless of any evidence presented to them, they could not form a basis for a reasonable determination of proper cause for indictment and/or the return of a true bill.

■ There is no factual basis to support such a motion. This Court presumes that the government has acted in good faith. The defendants will be adequately protected at a trial where the Court will instruct the jury on the proper law for their deliberation before rendering a verdict.

### C. *Grand jury bias.*

■ The defendants seek to dismiss the indictment on the basis of grand jury bias in three particulars. The first is that the foreman of the grand jury was the president of a bank and a member of the Louisiana Bankers Association. The defendants argue that because banks were in competition with Louisiana Loan and Thrift for deposits of money from the public, this grand juror was biased against LL&T.[1] The second is that one of the grand jurors was related by marriage to a director of LL&T. The

defendant Anzelmo argues that this grand juror was prejudiced against LL& T.[2] In order to dismiss an indictment because of the presence of grand jurors on the panel who are not impartial, the defendant must show (a) that the particular grand juror or jurors were in fact prejudiced, and (b) that after elimination of the prejudiced juror or jurors, the indictment was returned by less than twelve jurors. Castle v. United States, 238 F.2d 131 (8th Cir. 1956). See also Rule 6(b) (2), F.R.Crim.P. The defendants have failed to make such a showing.

The third alleged basis of grand jury bias is that preindictment publicity was so intense that (a) the publicity was inherently prejudicial, (b) the grand jurors felt compelled to return an indictment or (c) in any event, the rights of the defendants were substantially prejudiced and violated.

In the instant case, all the defendants, especially Jack P. F. Gremillion, the Attorney General of Louisiana, have been thrust upon the public eye almost daily in newspaper headlines, pictures, editorials, editorial cartoons and stories from July 1968 to the date of indictment. The local TV stations have small libraries of tapes concerning the financial collapse of LL&T and the resultant Board of Ethics, legislative and federal grand jury investigations.

The cases which have considered the question of preindictment publicity and its effect on the grand jury, rather than holding that preindictment publicity is inherently prejudicial and cause for dismissal of the indictment, have held that the defendant must show specifically that such publicity caused prejudice and bias in the grand jurors and that the indictment returned was the result of essential unfairness. Beck v. Washington, 369 U. S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); United States v. Osborn, 350 F.2d 497

---

1. Whether the grand juror was biased is pure speculation. Further, when the grand jury heard testimony in this case, LL&T was no longer in business and was no longer competing with the bank.

2. However, this again is pure speculation. Further, the contrary assumption would usually be made, *viz.*, the grand juror was prejudiced in favor of LL&T.

(6th Cir. 1965), aff'd 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1967); Estes v. United States, 335 F.2d 609 (5th Cir. 1964), cert. den. 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559, reh. den. 380 U.S. 926, 85 S.Ct. 884, 13 L.Ed.2d 814; Gorin v. United States, 313 F.2d 641 (1st Cir. 1963); Beck v. United States, 298 F.2d 622, at 627 (9th Cir. 1962), cert. den. 370 U.S. 919, 82 S.Ct. 1558, 8 L.Ed.2d 499 (1962); United States v. Nunan, 236 F.2d 576, at 593 (2d Cir. 1956), cert. den., 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957); United States v. Hoffa, 205 F.Supp. 710 (S.D.Fla.1962), aff'd sub. nom. Hoffa, et al. v. Lieb, 371 U.S. 892, 83 S.Ct. 188, 9 L.Ed.2d 125 (1962); and United States v. Dioguardi, 20 F.R.D. 33 (S.D.N.Y.1956).

There appears to be a lingering doubt whether one is entitled to an impartial grand jury. Judge Holtzoff, in United States v. Knowles, 147 F.Supp. 19 (D.D.C.1957), at 21, writes:

> "The basic theory of the functions of a grand jury does not require that grand jurors should be impartial and unbiased. In this respect, their position is entirely different from that of petit jurors. The Sixth Amendment to the Constitution of the United States expressly provides that the trial jury in a criminal case must be 'impartial.' No such requirement in respect to grand juries is found in the Fifth Amendment, which contains the guaranty against prosecutions for infamous crimes unless on a presentment or indictment of a grand jury."

This case was cited with approval in Estes v. United States, 335 F.2d 609 (5th Cir. 1964), cert. and reh. den., *supra.*

Judge Thornberry, in a concurring opinion in Martin v. Beto, 397 F.2d 741 (5th Cir. 1968), after wrestling with this question of preindictment prejudicial publicity concluded, reluctantly, that "the rule today is that the grand jury is an accusatory body which does not have to be impartial and that we depend on a fair trial * * *." However, the question

was raised whether the cases of Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) and Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) which were more recent than the grand jury cases previously cited would change the requirement that the defendant would have to show the specific prejudice. Judge Thornberry suggests that the inherently prejudicial rule adopted by the court in *Estes* and *Sheppard* for intense publicity at the *trial* stage should also be adopted at the *grand jury* stage.

■ This Court, judging this case on its particular merits, adopts the view expressed by Justice Douglas in his dissenting opinion in Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955 (1967):

> "The question is not whether one who receives large-scale adverse publicity can escape grand jury investigation nor whether the hue and cry attendant on adverse publicity must have died down before the grand jury can make its investigation. This case shows the need to make as sure as is humanly possible that one after whom the mob and public passion are in full pursuit is treated fairly, that the grand jury stands between him and an aroused public * * *." At 587, 82 S.Ct. at 979.

Therefore, this Court rejects the contention that the inherently prejudicial rule, proper at the trial level, is applicable to grand jury procedures because such a rule could prevent or postpone grand jury investigations. This Court adheres to the requirement of specific showing of prejudice, with an admonition to the prosecution that it maintain the necessary procedures to insure dispassionate consideration by the grand jurors of the charges presented.

### D. *Irregular attendance.*

The defendants also seek to dismiss the indictment because of irregular attendance of members of the grand jury. The defendants are not specific in their attack but we interpret it to mean that (1) a quorum was lacking on some or all days

when the grand jury took testimony, deliberated and/or voted, and (2) the twelve or more jurors who voted to return the true bill were not all present during the taking of all testimony.

The law is clear that it is not necessary that those who vote to return a true bill be present at every grand jury session to hear all the evidence relative to an indictment which is returned. Lustiger v. United States, 386 F.2d 132 (9th Cir. 1967), cert. den. 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142 (1968); United States ex rel. McCann v. Thompson, 144 F.2d 604 (2d Cir. 1944); United States v. Armour & Co., 214 F.Supp. 123 (D.C.Cal.1963); In re Meckley, 50 F.Supp. 274 (D.C.Pa.1943), aff'd 137 F.2d 310 (3rd Cir. 1943), cert. den. 320 U.S. 760, 64 S.Ct. 69, 88 L.Ed. 453 (1943). Further, the defendants have failed to produce any evidence which would sustain either attack.

### E. *Illegal evidence.*

The defendants allege that illegal evidence was presented to the grand jury. However, no defendant is entitled to have an indictment dismissed because it was obtained by means of illegally obtained evidence. United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). This rule dates as far back as 1852, in the case of United States v. Reed, 27 Fed.Cas. 727, where Justice Nelson, on circuit, wrote "No case has been cited, nor have we been able to find any, furnishing an authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof * * *," at 738. If the rule were changed "[i]t would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designated to bring about a fair verdict." Costello v. United States, *supra*, at 364, 76 S.Ct. at 409.

There is authority for the court to grant, on its discretion, a defendant's motion to dismiss an indictment which has been obtained solely through illegally obtained evidence and there is no other competent evidence to sustain the indictment. Truchinski v. United States, 393 F.2d 627, 632 (8th Cir. 1968), cert. den. 393 U.S. 831, 89 S.Ct. 104, 21 L.Ed. 2d 103; United States v. Tane, 329 F.2d 848, 853 (2d Cir. 1964); Coppedge v. United States, 114 U.S.App.D.C. 79, 311 F.2d 128, 132 (1962), reversed on other grounds 369 U.S. 438, 82 S.Ct. 917, 8 L. Ed. 2d 21; Carrado v. United States, 93 U.S.App.D.C. 183, 210 F.2d 712, 717 (1953), cert. den. sub nom. Atkins v. United States, 347 U.S. 1018, 74 S.Ct. 874, 98 L.Ed. 1140 (1954); Stewart v. United States, 300 F. 769, 777 (8th Cir. 1924).

But here, this Court finds that the defendants have failed to produce any evidence that illegally obtained evidence was presented to the grand jury.

### F. *Summaries of testimony.*

The defendants seek to dismiss the indictment on the basis that summaries of testimony taken before a prior grand jury were read to the grand jury which returned the instant indictment. As this objection relates to the indictment under attack, the objection is no good. An indictment will stand even though it is based on hearsay alone, Costello v. United States, 350 U.S. 359, 76 S.Ct. 406 (1956).

Further, the government denies that summaries of the testimony before the first grand jury were presented to the indicting grand jury. Whenever the government decided that the second grand jury should hear evidence which had previously been presented to the first grand jury, that particular witness was recalled and reexamined in person. The one exception to this procedure was in

the case of co-conspirator A. Clayton James. Mr. James died after appearing before the first grand jury and before the second grand jury was called. The transcript of Mr. James's testimony was read because the witness himself was unavailable; and this testimony was not summarized or digested, but read in its entirety. Such a procedure does not violate the secrecy of the first grand jury; it is commanded by common sense; and it has been approved in In re Grand Jury Investigation of Banana Industry, 214 F.Supp. 856 (D.Md.1963).

### G. Secrecy.

Defendants allege that the grand jury secrecy was breached in that (1) there was an unauthorized person before the grand jury and (2) a Securities and Exchange Commission attorney reviewed transcripts.

■ As to the first allegation, there is no proof that any unauthorized person was present in the grand jury proceedings which returned the instant indictment. As regards the second allegation, it has no legal force. United States v. United States District Court for Southern District of West Virginia, 238 F.2d 713 (4th Cir. 1956), cert. den. sub. nom. Valley Bell Dairy Co. v. United States, 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957), held that government attorneys conducting the grand jury were entitled to transcripts of the grand jury for investigative purposes. United States v. Hoffa, 349 F.2d 20, 43 (6th Cir. 1965), aff'd 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed. 2d 374 (1966) held there was " * * * nothing irregular in the limited disclosure of Grand Jury minutes to the Special Consultant to the Attorney General and the agents of the F.B.I. who were working on the case." Accord, United States v. Zirpolo, 288 F.Supp. 993, 1015 (D.N.J.1968). United States v. Culver, 224 F.Supp. 419, 432 (D.Md.1963), held that it was permissible for the grand jury to turn over records which the jury had subpoenaed to the United States Attorney who, in turn, disclosed these records to a postal inspector. We are mind-

ful of In re Grand Jury Proceedings, 309 F.2d 440 (3rd Cir. 1962), which held that attorneys for the Federal Trade Commission were not "attorneys for the government" within the meaning of F.R.Crim. P. 6(e) and thus not entitled to disclosure of the grand jury transcript for an administrative investigation but we hold this case not to be controlling here. Mr. Kelley, attorney for the SEC, and Mr. Callahan, accountant for the SEC, were frequently functioning as investigative agents, similar to F.B.I. agents, and under the above cited cases entitled to a copy of the grand jury proceedings. We hold that the grand jury secrecy was not violated when Mr. Kelley and Mr. Callahan reviewed and/or received copies of the transcript of the grand jury proceeding.

### H. Transcribing the proceeding.

■ The defendants seek to dismiss the indictment on the basis that only portions of the grand jury testimony were transcribed. But a transcript of the grand jury proceedings is not required. Nipp v. United States, 422 F.2d 509 (10th Cir. 1969), cert. den. sub nom. Bishop v. United States, 397 U.S. 1008, 90 S.Ct. 1235, 25 L.Ed.2d 420; 399 U.S. 913, 90 S.Ct. 2213, 26 L.Ed.2d 569; United States v. Watson, 421 F.2d 1357 (9th Cir. 1970); Reyes v. United States, 417 F.2d 916 (9th Cir. 1969); Baker v. United States, 412 F.2d 1069 (5th Cir. 1969); Jack v. United States, 409 F.2d 522 (9th Cir. 1969); Loux v. United States, 389 F.2d 911 (9th Cir. 1968); United States v. Cianchetti, 315 F.2d 584 (2d Cir. 1963).

### I. Reading the indictment.

The defendants finally seek to dismiss the indictment for the government's failure to comply with Rule 6(f) F.R.Crim.P. in that the indictment was not read to the grand jury. The evidence at the hearing showed that the indictment was read in its entirety to the grand jury.

### II. ESTOPPEL

The defendants seek to dismiss the indictment on the theory that the govern-

ment is estopped from prosecution. The basis of the estoppel argument is that Mr. Green, the Regional Administrator of the SEC, allegedly (1) accepted as true and did not dispute the opinions of the Attorney General of Louisiana and of the Louisiana State Banking Commissioner which stated that LL&T was subject to state banking laws, (2) initially advised LL&T that it was not subject to SEC regulation, (3) for approximately three years did not attempt to regulate LL&T in accordance with SEC regulation, and (4) only when the financial collapse of LL&T was apparent, exercise the SEC jurisdiction over LL&T.

 Even assuming such allegations to be correct, the United States government cannot be estopped from the prosecution of its criminal laws. A similar contention was advanced and accepted previously in this district, (United States v. New Orleans Chapter, Associated General Contractors of America, 238 F.Supp. 273 [E.D.La.1964]), but was summarily dismissed by the Supreme Court. United States v. New Orleans Chapter Associated General Contractors of America, Inc., 382 U.S. 17, 86 S.Ct. 33, 15 .L.Ed.2d 5 (1965), reh. den. 382 U.S. 933, 86 S.Ct. 307, 15 L.Ed.2d 345. *See also,* Times-Picayune Publishing Co. v. United States, 345 U.S. 594, at 623–624, 73 S.Ct. 872, 97 L.Ed. 1277 (1952); United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, at 226, 60 S.Ct. 811, 84 L.Ed. 1129 (1939).

 In addition, the principles of equitable estoppel are not applicable to actions of the SEC in civil proceedings. The Securities Exchange Act provides:

"No action or failure to act by the Commission * * * shall be construed to mean that the * * * authority has in any way passed upon the merits of, or given approval to, any security or any transaction or transactions therein, nor shall such action or failure to act with regard to any statement or report filed with or ex-

amined by such authority pursuant to this chapter or rules and regulations thereunder, be deemed a finding ·by such authority that such statement or report is true and accurate on its face or that it is not false or misleading. * * ·* " 15 U.S.C. § 78z.

Capital Funds, Inc. v. Securities and Exchange Commission, 348 F.2d 582 (8th Cir. 1965); S. E. C. v. Culpepper, 270 F.2d 241 (2d Cir. 1959); S. E. C. v. Morgan, Lewis & Bockius, 209 F.2d 44 (3rd Cir. 1953); Mines and Metals Corp. v. S. E. C., 200 F.2d 317 (9th Cir. 1952).

### III. IMMUNITY OF THE ATTORNEY GENERAL

Defendant Gremillion seeks to dismiss the indictment on the basis that his official conduct is absolutely immune from prosecution under the Securities Act of 1933 ,or the Mail Fraud Statute. His theory is that the traditional immunity from civil actions enjoyed by the judiciary, certain related judicial officers, and government officials extends to him in his capacity as Attorney General, the highest judicial officer of the State of Louisiana. He argues that since he cannot be civilly liable for opinions which are unfavorable to one party or which later turn out to be incorrect, he cannot be prosecuted here for conspiracy and violations of the SEC and mail statutes arising out of opinions he issued which three years later are determined to be incorrect. He argues, not that he is absolutely immune from any criminal prosecution, but only that, with the exception of a prosecution for corruption in office, he is immune from criminal prosecutions which stem from an official act of his office. The government argues that Gremillion is not immune from this criminal prosecution. They stress that he was indicted not simply for issuing an erroneous opinion but for his overall participation in a fraudulent scheme and for using his official position in furtherance of that scheme.

Neither side has cited any case dispositive of this issue.[3] We think it helpful in such a situation to analyze the policy considerations underlying the immunity doctrine to see if any reasons exist for granting immunity in this situation. As a general rule, all people are liable, civilly and criminally, for their individual actions. The traditional reason for granting any sort of immunity to judicial (or other government) officials is the strong public interest in securing for those officials a degree of independence of action by freeing them from vexatious suits instituted by those dissatisfied by their official actions. A contrary rule "would tend to the scandal and subversion of all justice, and those who are the most sincere, would not be free from continual calumniations * * *." Floyd and Barker, 12 Coke 23, 25 (1608); Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871).

Clearly, this reasoning would support a grant of immunity from civil liability and Gremillion cites a long line of authority establishing a doctrine of judicial immunity from civil liability in American jurisprudence.[4] This authority, however, does not support, for two reasons, the immunity from criminal prosecution that Gremillion seeks. First, these cases often regard an official's misconduct "as an injury to the public and not as one to the individual. It is to be redressed in some sort of public prosecution, * * *" Yaselli v. Goff, 12 F.2d 396, 404 (2d Cir. 1926); Smith v. Parman, 101 Kan. 115, 165 P. 663. As Mr. Justice Brewer of the Supreme Court, sitting as a Circuit Justice wrote in Cooke v. Bangs, 31 F. 640 (C.C.Minn. 1887):

"* * * [a judge] is just as amenable to the criminal law as any private citizen. There is no judge, from the judge of the supreme court of the United States at Washington, to a justice of the peace in the smallest township of the state, who, acting on any judicial matter from corruption or from malice, but becomes amenable to the criminal law the same as any other man, and may also be removed from office by proper proceedings. So there is no danger of judges as a class feeling that they are above the law, or becoming independent of the law, or indifferent to the rights of others." At 642.

Secondly, civil suits are easily adaptable for harassment purposes since any individual can institute a civil suit against another for whatever motive. Without immunity, judicial officials who dissatisfy certain people might easily be plagued by a rash of civil suits predicated on their official conduct. Bradley v. Fisher, supra, 80 U.S. at 348–349. The public would indeed be the losers if these officers had to spend their time defending such civil suits and not per-

---

3. The government relies on United States v. Manton, 107 F.2d 834 (2d Cir. 1938), wherein a United States Circuit Judge was convicted of conspiracy to obstruct the administration of justice and to defraud the United States. Defendant Gremillion dismisses *Manton* as totally inapposite. In his view, *Manton* concerned an indictment for "corrupt" performance of judicial functions where the correctness of the judicial opinion was immaterial, whereas here the entire indictment is based on the alleged incorrectness of an opinion officially issued by the Attorney General.

4. Randall v. Brigham, 74 U.S. (7 Wall.) 523, 19 L.Ed. 285 (1868); Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871); Pierson v. Ray, 386 U.S.

547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Cooke v. Bangs, 31 F. 640 (C.C.Minn.1887); Yaselli v. Goff, 12 F.2d 396 (2d Cir. 1926). This judicial immunity applies to justices of the peace (Cooke v. Bangs, *supra*); attorneys in the presentation of the client's case to the court or jury (dicta in Yaselli v. Goff, *supra*, Hoar v. Wood, 3 Metc. (Mass.) 193); statements made by witnesses testifying in court (dicta in Yaselli v. Goff, *supra*); public officials in the performance of a duty imposed by law (Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896); and to Assistant United States Attorneys for prosecution instituted with malice and without probable cause (Yaselli v. Goff, *supra*).

forming their official functions. In contrast, this criminal prosecution was initiated by government officials in solemn performance of their duties and only after the defendants were indicted by a grand jury. Clearly, the potential for harassment which might be present if judicial officers had to defend civil suits instituted by anyone is not present in criminal prosecutions.

Gremillion admits that he is not absolutely immune from criminal prosecution but argues that he can only be prosecuted for corruption and not for the substantive crimes he is here charged with. He relies on a line of cases which prohibit the criminal prosecution of quasi-judicial officers for malfeasance in office unless corruption or fraud is alleged. Commonwealth v. Hubbs, 137 Pa.Super. 244, 8 A.2d 618 (1939); Commonwealth v. Wood, 116 Ky. 748, 76 S.W. 842 (1903); Commonwealth v. McSorley, 189 Pa.Super. 223, 150 A.2d 570 (1959). Presumably, then, his argument is that the stiff requirements of corruption or fraud represents a threshold designed to protect officials from harassment by criminal prosecution. To subject him to a prosecution in which fraud need not be proved, and it need not in certain of the counts he is here charged with, would invite the harassment he should be protected from.

We do not find Gremillion's reasoning persuasive. First, the authorities he cites merely hold that if Gremillion were to be prosecuted for malfeasance in office, he would have to be charged with fraudulent or corrupt conduct. They do not say, as Gremillion claims, that a quasi-judicial officer can only be prosecuted for corruption. Secondly, we do not see how Gremillion can argue harass-

ment merely because certain of the counts he is charged with do not require proof of fraudulent conduct. The initial protections from harassment are still there—government officials must initiate proceedings and a grand jury must indict.

We think it a basic proposition that all criminal conduct is to be prosecuted.[5] We recognize the immunity doctrine as a narrow exception to this rule and approve of its use to further the legitimate public interest in securing a degree of independence for public officials. We do not see how that public interest would be served by extending the doctrine to include this defendant. It is doubtful that an official will act with any greater independence if the law grants him immunity from a substantive crime like fraud but allows a prosecution for corruption based on the same facts. We do not here decide that a judicial official can never be immune from criminal prosecution.

■■■ If the indictment had only alleged that defendant Gremillion in his *official capacity* as Attorney General of Louisiana had issued *erroneous* opinions that the bond investment certificates were not "securities" (Count 1, ¶ 7), that these bond investment certificates were exempt from registration (Count 1, ¶ 9), or that LL&T could operate branch offices in more than one parish in Louisiana (Count 1, ¶ 16), then defendant Gremillion might have made a stronger case for immunity. Here, the indictment alleges that Gremillion was a central figure in a scheme to fraudulently sell securities. The indictment alleges that Gremillion was instrumental in founding LL&T (Count 1, ¶ 3); that he counseled, advised and aided the management of

5. *Cf.*, Baird v. United States, 196 F. 778 (8th Cir. 1912), where it was argued that an attorney should be immune from prosecution because his only connection with the illegal affair was that of an attorney practicing his profession. The court answered the argument in this way:

"* * * but even members of the bar have no professional right to coun-

sel, advise, or assist others to violate the laws of the United States. They may properly defend them when charged with having committed crime, but in its prospective or current commission there is no privilege or immunity. All are equally amenable to the laws, lawyers as well as laymen." At 779.

LL&T (Count 1, ¶ 4); that he was a stockholder in LL&T although his ownership of stock was concealed (Count 1, ¶¶ 2 and 21); that he attended meetings of the LL&T Board of Directors (Count 1, ¶ 22s and u); and that he was paid large amounts of money in the form of fees, loans and dividends (Count 1, ¶ 22b, 3, r, x, and z). We merely hold that under these circumstances, Gremillion is not immune from criminal prosecution.

## IV. DEFECTS IN INDICTMENT

The defendants, in a shotgun approach, allege that 15 U.S.C. §§ 77e(a), 77e(c), 77q(a) and 77v(c) are unconstitutional because they are too vague and indefinite. Anzelmo finds further difficulty with 15 U.S.C. § 77v(c) alleging (1) it provides for compulsory incrimination in violation of the Fourth, Fifth and Sixth Amendments, the *Miranda* jurisprudence, and (2) it is a denial of due process.

■■ It cannot be seriously urged that the Securities Act of 1933 is unconstitutional. Oklahoma-Texas Trust v. Securities and Exchange Commission, 100 F.2d 888 (10th Cir. 1939). Nor can the defendants successfully argue that the Act is vague and indefinite. United States v. Wolfson, 405 F.2d 779, 783 (2d Cir. 1968), cert. den. 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969); United States v. Re, 336 F.2d 306, 315 (2d Cir. 1964), cert. den. 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177. A simple reading of 15 U.S.C. § 77v(c)[6] indicates that it is not violative of any prohibition of self incrimination or of due process.

This 16-count indictment is simply analyzed. Count 1 charges a single conspiracy on the part of all defendants (18 U.S.C. § 371) to violate the registration provisions of the Securities Act of 1933, 15 U.S.C. § 77e, the fraud provisions of that Act, 15 U.S.C. § 77q(a), and the mail fraud statutes, 18 U.S.C. § 1341. The remaining 15 counts can be placed in three separate groupings of 5 counts each, alleging the substantive acts of the alleged conspiracy. Counts 2 through 6 allege five separate violations of 15 U.S.C. § 77q(a), the fraud provisions of the 1933 Securities Act. Counts 7 through 11 allege five separate violations of 18 U.S.C. § 1341, the mail fraud statute. Counts 12 through 16 allege five separate violations of 15 U.S.C. § 77e(a), the registration provisions of the 1933 Securities Act and 18 U.S.C. § 2, aiding and abetting.

■ The defendants have moved to dismiss the indictment on the grounds that it does not contain a plain and concise statement of the facts and that it fails to state an offense as to any of them. This Court holds that the indictment does comply with Rule 7(c), F.R. Crim.P., in that the indictment is " * * * a plain, concise and definite written statement of the essential facts constituting the offense charged. * * *" We further hold that it does state an offense against each and every defendant in each and every count except that Counts 12 through 16 state offenses only against defendants Anzelmo, Bartlett, Gremillion and Ritchey, except Count 14, discussed *infra*.

Rule 7(c) has abolished the technical formalized pleading of an earlier era. Russell v. United States, 369 U.S. 749, 762, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).

---

6. "No person shall be excused from attending and testifying or from producing books, papers, contracts, agreements, and other documents before the Commission, or in obedience to the subpena of the Commission or any member thereof or any officer designated by it, or in any cause or proceeding instituted by the Commission, on the ground that the testimony or evidence, documentary or otherwise, required of him, may tend to incriminate him or subject him to a penalty or forfeiture; but no individual shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, documentary or otherwise, except that such individual so testifying shall not be exempt from prosecution and punishment for perjury committed in so testifying."

Today, indictments are considered "\* \* \* from the broad and enlightened standpoint of common sense and right reason rather than from the narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding." Parsons v. United States, 189 F.2d 252, 253 (5th Cir. 1951). See also, Belvin v. United States, 273 F.2d 583 (5th Cir. 1960); United States v. Vogt, 230 F.Supp. 607 (E.D.La.1964).

In determining the sufficiency of the indictment, two criteria reflect the guaranteed protections intended by an indictment. "These criteria are, first, whether the indictment 'contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what he must be prepared to meet,"' and, secondly, ' "in case any other proceedings are taken against him for a similar offence whether the record shows with accuracy to what extent he may plead a former acquittal or conviction" (cases cited).'" Russell v. United States, *supra*, at 763–764 of 369 U.S., at 1047 of 82 S.Ct.

■ Count 1 does state a conspiracy. The essential elements of a conspiracy are (1) that the conspiracy described in the indictment was willfully formed, and was existing at or about the time alleged; (2) that the accused willfully became a member of the conspiracy; (3) that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, at or about the time and place alleged; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy, as charged. 1 Devitt & Blackmar, Federal Jury Practice and Instructions, § 29.08 (1970). Each of these elements are stated in Count 1.

Counts 2 through 6 each charge separate violations of 15 U.S.C. § 77q(a), the fraud provisions of the 1933 Securities Act. The essential elements of this offense as stated in United States v. Attaway, 211 F.Supp. 682, 684 (W.D.La. 1962), are:

"1. The offer or sale of a security;

"2. By use of the mails or some means of transportation or communication in interstate commerce; and

"3. That the defendant intentionally did any of the following:

(a) employed a device, scheme or artifice to defraud;

(b) obtained money or property by means of material misrepresentations or material misleading omissions;

(c) engaged in a transaction, practice or course of business which would or did operate as a fraud or deceit upon a purchaser of securities."

Each of these elements are charged in Counts 2 through 6.

■ Counts 7 through 11 each charge a separate violation of 18 U.S.C. § 1341, the mail fraud statute. The essential elements of this offense are (1) formulation of a scheme to obtain money or property with intent to defraud, and (2) the use of the mails in furtherance thereof. Palmer v. United States, 229 F.2d 861 (10th Cir. 1956), cert. den. 350 U.S. 996, 76 S.Ct. 546, 100 L.Ed. 861, reh. den. 351 U.S. 958, 76 S.Ct. 844, 100 L.Ed. 1480; United States v. Attaway, *supra*, 211 F.Supp. at 684. Each of these elements are charged in Counts 7 through 11.

Counts 12 through 16 each charge a violation of 15 U.S.C. § 77e(a), the registration provisions of the 1933 Act, and of 18 U.S.C. § 2. Counts 13 and 15 charge a violation of 77e(a) (1), and the essential allegations are (1) a security was offered for sale, (2) through the use or medium of any prospectus or otherwise, (3) employing any means or instruments of transportation or communication in interstate commerce or the mails, and (4) that no registration statement was in effect as to such security at the time thereof. Counts 12 and 16 allege violations of 77e(a) (2) and the necessary allegations are "\* \* \* (1)

a 'security' was carried through the mails or in interstate commerce, (2) for the purpose of a sale or delivery after a sale, and (3) that no registration statement was in effect as to such security at the time thereof * * *," United States v. Attaway, *supra*, at 684. (See discussion *infra* on Count 14.)

██ The defendants seek to dismiss Count 1 on the basis that it charges, not one conspiracy, but three conspiracies. The argument is that since the object of the alleged conspiracy was violation of three separate criminal statutes, then three separate conspiracies should be charged. But this argument is without legal merit. As was said in Braverman v. United States, 317 U.S. 49, at 53–54, 63 S.Ct. 99, at 102, 87 L.Ed. 23 (1942):

"* * * [W]hether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.

"The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.' Frohwerk v. United States, 249 U.S. 204, 210 [39 S.Ct. 249, 63 L.Ed. 561]; Ford v. United States, 273 U.S. 593, 602 [47 S.Ct. 531, 71 L.Ed. 793]; United States v. Manton, 107 F.2d 834, 838."

Defendants further contend that Count 1, the conspiracy charge, must be dismissed if the government prosecutes substantive Counts 2 through 16. Defendants rely on United States v. Zeuli, 137 F.2d 845, 846 (2d Cir. 1943), where Judge Learned Hand wrote

"* * * if a crime necessarily involves the mutual cooperation of two persons, and if they have in fact committed the crime, they may not be convicted of a conspiracy to commit it."

██ But *Zeuli* is totally inapposite here. None of the substantive offenses charged here necessarily involve the mutual cooperation of two persons. There is a distinction between the substantive offense of mail fraud and a conspiracy to violate the mail fraud statute. Isaacs v. United States, 301 F.2d 706, at 725 (8th Cir. 1962). For a conspiracy, it is essential that there be an agreement between two parties, whereas a single individual, acting alone, can violate the mail fraud statute. See United States v. Cacchillo, 416 F.2d 231 (2d Cir. 1969).

United States v. Sager, 49 F.2d 725 (2d Cir. 1931) and United States v. Dietrich, 126 F. 664 (C.C.Neb.1904), which defendants cite, are cases involving bribery, an offense which necessarily involves the mutual cooperation of two persons and are as inapposite as *Zeuli*, *supra*.

██ We take it to be hornbook law that the commission of the substantive offense and a conspiracy to commit that substantive offense are separate and distinct offenses, even though both offenses arise from the same facts. Count 1 is not duplicitous; it neither charges more than one conspiracy nor does it charge the same offense alleged in Counts 2 through 16.

██ Defendants have alternatively moved the Court to sever or to compel the government to elect between the conspiracy count and the substantive Counts 2 through 16. Defendants have cited United States v. Solomon, 26 F.R.D. 397 (S.D.Ill.1960), where that court did require election between six substantive counts and a conspiracy count. But such a motion is left to the discretion of the court. At this time, the Court is not disposed to grant such a motion.

██ The defendants have filed a motion to dismiss Counts 3, 4, 5 and 6 on the ground that they charge the same offense charged in Count 2. Relying on United States v. Hughes, 195 F.Supp. 795 (S.D.N.Y.1961) and United States v. Greenberg, 30 F.R.D. 164 (S.D.N.Y. 1962), defendants claim that under the

statutory framework of 15 U.S.C. § 77q(a), the unit of prosecution is the scheme to defraud, and separate mailings which are incidental to or in furtherance of a scheme do not constitute separate offenses. Unfortunately for defendants, the Fifth Circuit has recently rejected their argument in Sanders v. United States, 415 F.2d 621 (1969), holding "* * * the proper construction of 15 U.S.C.A. § 77q(a) is that each fraudulent offer or sale of any security accompanied by mailing or use of any means or instruments of transportation or communication in interstate commerce is a separate crime." (Citations omitted). Defendants' argument is also weakened in that United States v. Ketchum, 320 F.2d 3 (2d Cir. 1963); United States v. Van Allen, 28 F.R.D. 329 (S.D. N.Y.1961); and United States v. Binstock, 37 F.R.D. 13 (S.D.N.Y.1965), have rejected *Hughes* and *Greenberg*.

The defendants allege that the 16-count indictment is multiplicious in that there is basically only a single offense split up into 16 alleged separate offenses. This argument is that only one offense has been charged: a fraudulent scheme to sell securities, and this one offense has been multiplied fifteen times by fifteen separate uses of the mail and once by an alleged conspiracy. This argument is similar to one urged under *Hughes* and *Greenberg, supra.*

We have previously stated that the conspiracy count is neither duplicitous nor multiplicious. Counts 2 through 6 charge a separate violation of 15 U.S.C. § 77q(a), Sanders v. United States, *ante.*

 Counts 7 through 11 allege separate violations of 18 U.S.C. § 1341, the mail fraud statute. It is settled that each separate use of the mails in the execution of a scheme to defraud constitutes a separate offense. Badders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706 (1916), Justice Holmes.

 Counts 12 through 16 allege separate violations of 15 U.S.C. § 77e(a), the registration provisions of the 1933 Securities Act. Because each of these counts involve a separate use of the mails in connection with the offer or sale of unregistered securities, each count alleges a separate offense. United States v. Binstock, 37 F.R.D. 13 (S.D. N.Y.1965); United States v. Van Allen, 28 F.R.D. 329 (S.D.N.Y.1961).

As was stated in U. S. v. Van Allen, *supra:*

"* * * 15 U.S.C.A. § 77q is directed at use of the mails in furtherance of a scheme to defraud in the sale of any securities. Thus, the gist of * * * § 77q is aimed at the existence of a fraudulent scheme in connection with such securities and registration or non-registration is immaterial. 18 U.S.C. § 1341 deals with any fraudulent scheme and is not limited to the securities field, and 15 U.S. C.A. § 77e(a) is aimed at preventing the carrying through the mails of any unregistered security for purposes of sale or for delivery after sale. Each of these [three] statutory provisions deal with different elements ꞌand the joinder in one indictment of counts charging violations of each of the sections is permissible. The same transaction may violate two distinct provisions of the same statute or different statutes and be punishable under both as separate substantive crimes. Gore v. United States, 1958, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405.

\* \* \* \* \* \*

"Each of the [three] statutory provisions involved in the present case requires proof which the others do not. There is no conflict in charging that a single act violates both the general mail fraud statute and the securities mail fraud provision. Edwards v. United States, 1941, 312 U.S. 473, 61 S.Ct. 669, 85 L.Ed. 957." At 342–343.

Since "the test to be applied to determine whether there are two offenses or only one [charged] is whether each provision requires proof of an additional fact which the other does not," Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), it is ob-

vious that this indictment charges 16 separate criminal offenses and does not merely charge a single offense.

Defendants also seek to dismiss Counts 2 through 11 because they are duplicitous. These counts each incorporate, by reference, paragraphs 2 through 22 of Count 1 (the conspiracy count). The basis of the duplicity argument is that in several of the paragraphs incorporated by reference is found the phrase "In furtherance of said conspiracy * * *." The defendants thus claim a conspiracy is charged in each of the subsequent substantive counts along with the substantive offenses.

■ The government correctly points out that ¶ 1 of Count 1 alleges the illegal agreement and ¶¶ 2 through 22 allege the scheme to defraud. Paragraph 1 of Count 1 was never incorporated by reference in Counts 2 through 12.

From a reasonable reading of the indictment, it is clear that such phrases as "In furtherance of said conspiracy" do not in fact charge a conspiracy. Had the government wanted to make such a blunder, it could have easily incorporated by reference ¶ 1 of Count 1 along with ¶¶ 2 through 22. It is obvious that the allegations which are incorporated by reference in the securities fraud counts (2 through 6) constitute the means by which the securities fraud statute was violated, and the allegations incorporated by reference in the mail fraud counts (7 through 11) constitute the scheme and artifice which is one element of mail fraud.

## V. AMENDING THE INDICTMENT

Defendant Anzelmo has moved to strike surplusage of immaterial and irrelevant allegations and charges pursuant to Rule 7(d). This motion is denied. However, a more serious question is whether the indictment can be amended by a joint written stipulation entered into by the government, all the defendants and their respective attorneys. In essence, the stipulation changes four dates in four separate substantive counts, and adds the name of the person allegedly defrauded in the sale of unregistered securities in Count 14.

The government contends that the amendments to Counts 3, 4, 5 and 6 (which are four of the five Securities Fraud counts) relate solely to typographical errors. These typographical errors occur in ¶ 2 of each of these counts and erroneously state the date of the use of the mails. In each instance, lines one and two of ¶ 2 of each count reflect this date as being the 30th day of March 1968. This was erroneously continued from Count 2 of the indictment. In the last sentence of ¶ 2 of each of these counts, the date is correctly stated: July 19, 1967 in Count 3; December 31, 1967 in Count 4; January 2, 1968 in Count 5; and October 16, 1967 in Count 6.

■ The Fifth Amendment provides that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury, * * *." This venerable common law right was initially rigorously and mechanically applied by federal courts, following the English Courts. This rigorism was changed by statute in 1872, and today indictments are interpreted in the light of Federal Rules of Criminal Procedure 7(c) [7] and

---

7. *"Nature and Contents.* The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. It shall be signed by the attorney for the government. It need not contain a formal commencement, a formal conclusion or any other matter not necessary to such statement. Allegations made in one count may be incorporated by reference in another count. It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that he committed it by one or more specified means. The indictment or information shall state for each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated.

52(a).[8] Today a court is without jurisdiction in a criminal case where the indictment, returned by the grand jury, has been amended in any material way, even with the consent of the defendant. However, a mere change in the form of the indictment is permitted. Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); United States v. Norris, 281 U.S. 619, 50 S.Ct. 424, 74 L.Ed. 1076 (1930); and Ex Parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887).

■ Unless time is an essential element of the offense charged, time is considered as "form" and not a material part of the indictment. Where time is not an essential ingredient of the offense charged and the indictment charges facts showing the offense was committed before the finding of the indictment and within the statutory period of limitations, a defect in the allegation of time is one of form only. United States v. Gammill, 421 F.2d 185 (10th Cir. 1970); United States v. Arge, 418 F.2d 721 (10th Cir. 1969); Stewart v. United States, 395 F.2d 484 (8th Cir. 1968); Jacobs v. United States, 395 F.2d 469 (8th Cir. 1968); Butler v. United States, 197 F.2d 561 (10th Cir. 1952); Weatherby v. United States, 150 F.2d 465 (10th Cir. 1945); and Hale v. United States, 149 F.2d 401 (5th Cir. 1945).[9]

■ Unless the statute under which the indictment is brought either expressly makes it so or it appears clear that the statute is intended to have such effect, the exact time of the commission of the offense charged is not a substantive element of the proof. Huffman v. Siegler, 352 F.2d 370 (8th Cir. 1965). The essential elements of 15 U.S.C. § 77q(a), the statutory violations of Counts 3, 4, 5 and 6 are discussed *infra* (IV—Defects in Indictment). But here the date in the indictment is not a material allegation inasmuch as it is not descriptive of the offense and need not be precisely proven other than to establish that it occurred within the statute of limitations. *Cf.*, Stewart v. United States, 395 F.2d 484 (8th Cir. 1968), at 488 and cases cited there.

It is true that use of the mails is one essential element of the offense charged and that each separate use of the mails is a separate offense, which might indicate time is an essential element. However, Jacobs v. United States, 395 F.2d 469 (8th Cir. 1968), has held that exact time is not an essential element of the offense of mail fraud, 18 U.S.C. § 1341, which statute has the similar characteristics of the use of mails and each separate use constituting a separate offense.

■■ For the foregoing reasons, we conclude that the exact time of the commission of the offense condemned in 15 U.S.C. § 77q(a) is not an essential element of that offense. Therefore, the amendment of the indictment in Counts 3, 4, 5 and 6 is an amendment in form only.

Because defendants and their counsel entered into the written stipulation, defendants' Sixth Amendment rights to know the precise charge they are to defend are well observed.

However, the amendment to Count 14 of the indictment is not valid. Paragraph 2 of Count 14 without the amending language reads, "On or about the 26th day of September 1967, * * * defendants * * * did cause to be delivered by the Post Office Establishment of the United States, according to the

---

8. *"Harmless Error.* Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

Error in the citation or its omission shall not be ground for dismissal of the indictment or information or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice."

9. *See also*, Ledbetter v. United States, 170 U.S. 606, 18 S.Ct. 774, 42 L.Ed. 1162 (1898); Berg v. United States, 176 F.2d 122 (9th Cir. 1949); Thompson v. United States, 283 F. 895 (3rd Cir. 1922).

directions thereon, an envelope containing a letter and check addressed to Louisiana Loan and Thrift Corporation, New Orleans, Louisiana." The amendment would add the name and address of the person sending that letter to LL&T, *viz.*, " * * * an envelope containing a letter and check from Alvin E. Moore, 916 Beach Boulevard, Waveland, Mississippi, addressed to Louisiana Loan and Thrift * * *."

This amendment of Count 14 is not valid because it adds an essential allegation of fact which materially changes the count. The factual allegation setting forth the precise use of the mails is essential because without such allegation there is no way to distinguish among the five counts charging the sale of unregistered securities, 15 U.S.C. § 77e(a). (Counts 12, 13, 14, 15 and 16) This is equally true of Counts 2 through 6 charging fraud in the sale of securities, 15 U.S.C. § 77q(a), and of Counts 7 through 11 charging mail fraud, 18 U.S.C. § 1341.

■■■ The precise factual allegation of the use of mail is essential. Rule 7(c), Nature and Contents, provides "The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. * * *" Had this fact been entirely omitted from the count, the defendants would have been prejudiced in not knowing exactly what offense they were charged with or what defenses to prepare. Since LL&T was in business for three years, it is reasonable to assume that more than fifteen letters had been sent or received. Any of these mailings could have formed the basis of this particular count.

For either the prosecution, the Court, the defendants, or all parties to amend the indictment so that it would sufficiently describe the use of the mails charged in Count 14 would be to unconstitutionally derogate unto themselves, in contravention of the Fifth Amendment, the function of the grand jury. Russell v. United States, supra, 369 U.S. at 770–771, 82 S.Ct. 1038. Thus, the amendment

of Count 14 cannot stand. Neither can Count 14, unamended, stand. Therefore, Count 14 must be dismissed.

## VI. DISCOVERY

All discovery motions will be treated as one.

Initially, the Court points out that the prosecution has already supplied the defendants with (1) all the evidence in its possession favorable to the defendants, (2) copies of physical and documentary evidence in its possession, and (3) a transcript to each defendant of his testimony given to the grand jury.

The Court also notes that the government has offered to make available to the defense the following:

(1) To each defendant, copies of his statement or memorandum of the same made to investigating officers;

(2) A list of government witnesses, their statements or memoranda of their interviews no later than ten days before trial;

(3) Any additional physical and documentary evidence that the government intends to use at trial, as it becomes available to the government;

(4) Reports of any expert witness the government may use (see also rulings in the bill of particulars);

(5) Any books, papers, documents and tangible objects which the government may have obtained from each defendant; and

(6) Any records of LL&T and Savings Guaranty Corporation which may be in the government's possession.

The Court, as a result of the testimony taken at the hearing on these motions, finds that (1) the defendants were not the subject of any direct microphone surveillance nor electronic monitoring initiated by, participated in or used by the federal government in connection with this case, and (2) the testimony of government agents and government counsel before the grand jury was not recorded.

■■■ The defense request for a list of witnesses is denied. The government,

except in a capital case, is not required to furnish the list of its witnesses. Rosenzweig v. United States, 412 F.2d 844 (9th Cir. 1969); Edmondson v. United States, 402 F.2d 809 (10th Cir. 1968); United States v. Chase, 372 F.2d 453, 466 (4th Cir. 1967).

Rule 16(b) provides:

" * * * this rule does not authorize the discovery or inspection of * * * statements made by government witnesses or prospective government witnesses (other than the defendant) to agents of the government except as provided in 18 U.S.C. 3500."

Under 18 U.S.C. § 3500(a) no statement need be produced until after the government witness has testified. Palermo v. United States, 360 U.S. 343, 349, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959).

There is no reason to believe that co-defendants will not swap their own statements and testimony given before the grand jury. Indeed, defendant Kavanaugh, in his motion for severance, quotes from the grand jury testimony of one of his co-defendants. A request by one co-defendant for the statement of his other co-defendants was refused in United States v. Edwards, 42 F.R.D. 605 (S. D.N.Y.1967).

The defendants are asking for a transcript of all testimony taken before the grand jury, especially that of co-conspirator Glennon. The government opposes such a request. This presents a particularly difficult question involving the traditional secrecy of the grand jury versus the liberalized tendency of discovery in criminal procedure. There is a complexing split of authorities, not only in the several circuits but even in the Fifth Circuit, over whether a defendant need show only that such a request is "material to the preparation of the defense" or whether the defendant must show a "particularized need" for the grand jury transcript. At this point, it must be remembered that each co-defendant has been given a copy of his own testimony before the grand jury.

The latest Supreme Court case in this area is Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), which held that an accused, after showing a particularized need, is entitled to examine the grand jury minutes relating to trial testimony of government witnesses while these witnesses are available for cross examination. The Court in *Dennis* relied on United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 234, 60 S.Ct. 811, 849, 84 L.Ed. 1129 (1940), which acknowledged that "after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it" and on United States v. Proctor & Gamble Co., 356 U.S. 677, 683, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077 (1958) which stated that "problems concerning the use of the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility * * * [are] cases of particularized need where the secrecy of the proceedings is lifted discreetly and limitedly."

The 10th Circuit in Cargill v. United States, 381 F.2d 849 (10th Cir. 1967), indicates that the particularized need doctrine is merely a formal requirement. At 851-852, it states:

"The [Dennis] Court retains the requirement that 'particularized need' be shown in order that the secrecy may be lifted, but holds in effect that such need is shown when the defense states that it wishes to use the transcript for the purpose of impeaching a witness, to refresh his recollection or to test his credibility. Thus the Court as far as cross-examination is concerned has removed most, if not all, of the substance from the particularized need requirement, although it has retained the term. Under this opinion, it appears that the defense is entitled to the grand jury transcript of the witness's testimony when the jury's functions are ended, and when the request is made during the course of trial that it is necessary for the purpose of cross examining such witness for the above mentioned purposes."

The Second Circuit, in United States v. Youngblood, 379 F.2d 365 (2d Cir. 1967), formulated a prospective rule that a defendant is entitled as of right, without any showing of particularized need, to examine *at his trial* the grand jury testimony of all witnesses at his trial on the subjects about which these witnesses testified at trial.[10] The District of Columbia Circuit, in Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968) formulated a *per se* rule that a defendant automatically has the requisite need for the grand jury testimony of a police officer who testifies in relation to a confession, allegedly given by a defendant.

The Fourth, Sixth and Eighth Circuits have retained the particularized need principle. *See* United States v. McGowan, 423 F.2d 413 (4th Cir. 1970); United States v. Johnson, 414 F.2d 22 (6th Cir. 1969); Hanger v. United States, 398 F.2d 91 (8th Cir. 1968); and National Dairy Products Corp. v. United States, 384 F.2d 457 (8th Cir. 1967).

The proposition that pre-trial discovery of grand jury proceedings be granted generally to defendants on a request that it is necessary for the preparation of the defense has been rejected in the Sixth and Eighth Circuits in United States v. Johnson, *supra*, and Hanger v. United States, *supra*.

Defendants rely on United States v. Hughes, 413 F.2d 1244 (5th Cir. 1969) for the proposition that they should be entitled to pre-trial discovery of all the grand jury proceedings. In *Hughes*, the court held that grand jury transcripts are "documents" within the meaning of Rule 16(b) and discoverable upon a showing of materiality and not a showing of "particularized need." *Hughes* holds, in effect, that the enactment of Rule 16

has overruled the prior judicial interpretations of Rule 6(e) which required a particularized need.

This Court believes the better rule to be that discovery of grand jury testimony is governed by Rule 6(e) and 16(a), and not by Rule 16(b). *Cf.*, James v. United States, 416 F.2d 467 (5th Cir. 1969), at 476, footnote 1. Rule 16(b) (3) of the Proposed Amendments to Criminal Rules is in accord with our view. This rule would provide

"(3) Grand Jury Transcripts. Except as provided in Rule 6 and subdivision (a) (1) (i) of this rule, these rules do not relate to discovery or inspection of recorded proceedings of a grand jury."

In White v. United States, 415 F.2d 292 (5th Cir. 1969), James v. United States, 416 F.2d 467 (5th Cir. 1969), and Posey v. United States, 416 F.2d 545 (5th Cir. 1969), this circuit has held to the requirement of particularized need, while distinguishing *Hughes* in every instance. In United States v. Davis, 424 F.2d 1241 (5th Cir. 1970), it was held that the defendant was not entitled to the transcripts of those parties who appeared before the grand jury but who did not appear before the petit jury.

James v. United States, *supra*, upheld the trial judge's practice of an *in camera* inspection of the grand jury transcript of two co-conspirators who had testified at the trial. *James* rejected the liberalized view and reasoning of *Hughes* and relied on Menendez v. United States, 393 F.2d 312 (5th Cir. 1968) as the appropriate guide. In *Menendez*, disclosure of grand jury transcripts was determined under Rule 6(e) F.R.C.P.

In the situation before the Court, the defendants have shown neither a partic-

10. Both *Youngblood* and *Cargill, supra*, circumscribe that general rule with the following exception: the government, upon a showing that disclosure of particular material would jeopardize national security or should be denied for other reasons may seek a protective order from the trial court in order to prevent disclosure to the defendant of that particular portion of the grand jury material. If the government seeks such a protective order, the court would conduct an *in camera* examination, and any material excised would be sealed in an envelope to await argument on appeal. *See also*, Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840 (1966).

ularized nor a material need for the pretrial discovery of grand jury testimony of *all* witnesses who appeared before the grand jury. The defendants, especially defendant Anzelmo, in their motions assert that a particularized need does exist for the testimony of co-conspirators James and Glennon. However, the defendants have failed to show either a particularized need or a material need for such testimony.

 However, because the government has indicated that Glennon will definitely be a prosecution witness and because of the untimely death of James, the Court directs the government to furnish to each of the defendants, on the day of trial, a copy of the transcript of co-conspirators, Glennon and James.

 Although the Federal Rules do not require that the government disclose to the defense a list of witnesses appearing before the grand jury, Ingle v. United States, 399 F.2d 690, 691 (9th Cir. 1968), in this case, most, if not all, the witnesses so appearing are already known. Accordingly, the Court, in its discretion, directs the government to provide the defense, on the day of trial, a list of all witnesses appearing before the grand jury.

Since no one kept summaries of unrecorded testimony before the grand jury, the government cannot (nor would it be required to) furnish such summaries.

 Any record of prior criminal convictions of persons whom the government intends to call as witnesses at trial is not discoverable under Rule 16(b). United States v. Conder, 423 F.2d 904 (6th Cir. 1970), at 910, and cases cited therein. However, if requested by the defense, the Court will direct the government to supply this information to the defendants, after each government wit-

ness has testified. This ruling anticipates Rule 16(a) (vi) of the Proposed Amendments to Criminal Rules.

 Reports of governmental agencies, internal memoranda of government agencies, and the work product of government agencies are not discoverable under Rule 16 F.R.C.P.

Finally, all defense motions for production by the government of all evidence in its possession favorable to the defense, are denied as being premature. Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Defendants request any relevant material or information which may have been provided by an informant. The Court wishes to point out that the prosecution does not consider co-conspirator Glennon as an informer. Without engaging in semantics, this Court has made specific rulings on the testimony of Mr. Glennon, *supra*.

In Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court held that during trial the court in its discretion may order the disclosure of the identity of an informer or the information he supplied the police, if the court finds such disclosure relevant and helpful to a fair disposition of the case.[11] Here, defendants have failed to show that any such information exists or what possible relevance any such information, if it did exist, might have in the determination of this case. Absent any such showing, and without deciding whether *Roviaro* applies to pre-trial discovery, this Court, in its discretion, will deny defendants' motion at this time. If any *Roviaro*-type situations should arise, this Court will then entertain appropriate defense motions for further discovery in accordance with the standards laid down in *Roviaro*.[12]

---

11. *See also*, McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), holding that the informer's identity need not be disclosed at a preliminary hearing to determine probable cause for arrest or for a search warrant.

12. In *Roviaro*, the court stated that " * * no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his de-

**1130**

## VII. SUPPRESSION MOTIONS

All defendants have brought motions to suppress evidence which allegedly was obtained unlawfully. Defendant Gremillion seeks to suppress evidence allegedly obtained illegally by wiretapping, unauthorized telephonic and electronic interceptions and the fruits thereof. After an evidentiary hearing, the Court finds (1) that a wiretap was found on Mr. Gremillion's home phone on May 24 and 25, 1968, and (2) that the federal government, through Mr. Louis LaCour, former United States Attorney for this district, and through Mr. Robert Rightmeyer, Special Agent in Charge of the F.B.I. for the State of Louisiana, disclaims any authorization of or participation in that or any other alleged wiretap of Mr. Gremillion. The Court concludes that the government has not obtained any evidence through this wiretap and that the government did not authorize, conduct, participate or share in any wiretap or electronic surveillance of Gremillion or any of the other defendants.

All the defendants generally allege that the government has illegally obtained evidence. None of the defendants introduced any specific evidence or testimony for this Court to determine which evidence was illegally seized, if any. Therefore, these motions are denied.

■ Defendant Anzelmo seeks the suppression of (1) all records, lists of securities, stockholders lists, stock books and records, passbooks, resolutions, accountings and summaries, and copies of correspondence taken from LL&T and (2) any and all statements or admissions, papers and documents given by William Glennon to the government. The basis

of the first request is that this information about LL&T was obtained without the advice of counsel and in violation of *Miranda*, in violation of the privacy of LL&T and in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments. Anzelmo and the other defendants have failed to produce sufficient evidence to substantiate any of their motions to suppress.

The Securities and Exchange Commission is empowered by 15 U.S.C. §§ 77s (b), 77u and 77v to hold hearings, subpoena witnesses, take evidence, and require the production of any books, papers or other documents which the SEC considers relevant or material to the inquiry. Mr. Kelley, the regional attorney for the SEC, testified that he had been authorized to exercise that power with respect to LL&T. He further testified that in August of 1966 defendant Bartlett voluntarily allowed the SEC examiners to review the records of LL&T; that again in January of 1968 Mr. Ritchey, an attorney himself, and Anzelmo voluntarily ordered the employees of LL&T to cooperate in every way possible with the examiners of the SEC in their inspection of the books and records.

■ Based on a careful analysis of the evidence as it relates to these motions, the Court is satisfied that none of the defendants' constitutional rights have been violated. The *Weeks* exclusionary rule is applicable to records of a corporation seized in violation of the Fourth Amendment, Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), but here the records were volunteered, not seized.[13] Further, it is well settled that

fense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." At 62, 77 S.Ct. at 628–629.

13. It is interesting to note that a similar motion was denied in United States v.

Mahler, 254 F.Supp. 581 (S.D.N.Y.1966). There, the Court refused to suppress the books and records of a broker dealer which were requested by the SEC, volunteered by the dealer and allegedly formed the basis of a subsequent indictment. After deciding that no illegal search or seizure had occurred, the court went on to say:

"In any event, it has been held that the Government is not prohibited from using

a corporation is not a "person" within the meaning of the privilege against self-incrimination and thus not entitled to invoke the Fifth Amendment. United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911); Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906).

The basis of the second request is that defendant Anzelmo claims to have been a law partner of co-conspirator Glennon. Anzelmo argues that the information Glennon has concerning LL&T is the privileged information of a small personal partnership identified with the individual person and, as such, protected by the Bill of Rights; that when Glennon was given immunity from prosecution for his information, this immunity must also extend to defendant Anzelmo; and that unless Anzelmo gave Glennon permission to divulge any information, this information was illegally obtained from Anzelmo.

There is no factual basis for concluding that a law partnership in fact existed. The testimony disclosed that (1) no partnership income tax returns were filed for the year in question; (2) there was no written agreement of partnership; (3) Glennon testified he never knew nor considered himself to be a law partner of Anzelmo in any way; (4) Anzelmo testified that the law partnership here claimed never extended to any other matter except the LL&T account; (5) Anzelmo and Glennon testified that although four attorneys' names appeared on their letterhead, this was to give their

separate clients the illusion of being represented by a law firm when, in fact, each attorney was a sole practitioner; and (6) Glennon testified that he and Anzelmo were associate counsel to LL&T but not law partners for this client. Obviously, there was no law partnership existing between Glennon and Anzelmo, even for the Louisiana Loan and Thrift client.

## VII. SEVERANCE

All of the defendants have individually requested a severance. Rule 14 provides "If it appears that a defendant * * * is prejudiced by a joinder of offenses or of defendants in an indictment * * * or by such joinder for trial together, the court may order an election or separate trial of counts, grant a severance of defendants or provide whatever relief justice requires."

■■■ Initially, it must be pointed out that the granting *vel non* of severance is discretionary with the trial judge. Opper v. United States, 348 U.S. 84, 99, 75 S.Ct. 158, 99 L.Ed. 101 (1954); Oden v. United States, 410 F.2d 103 (5th Cir. 1969). Moreover, joint trials are usually favored in conspiracy cases where the alleged offenses grew out of the same series of transactions. United States v. Wolfson, 294 F.Supp. 267 (D.C.Del. 1968) and cases cited at 275.

■■■ Here, the defendants have advanced various reasons why a joint trial of all would be prejudicial. But defendants, jointly indicted, are not entitled to separate trials merely because the different defendants will use antagonistic defenses. United States v. Hutul, 416 F.2d

evidence which was once illegally seized if the Government, possessing independent knowledge of the evidence, subsequently obtains it in a legal way. (Citations omitted) This case presents a more compelling factual situation, for not only did the Government have prior knowledge of the records, but the records were required by law to be kept and made available to the SEC for inspection, which, in turn, had statutory authority to turn evidence over to the Attorney General. Moreover, as noted

above, the records were not in fact illegally obtained. No coercion was employed, no privacy invaded. The defendants, acting with counsel, knew or should have known that the investigation could lead to indictment." At 584.
*Accord*, Estep v. United States, 223 F.2d 19, 21 (5th Cir. 1955); United States v. Kane, 243 F.Supp. 746, 752 (S.D.N.Y. 1965); State of Iowa v. Union Asphalt & Roadoils, 281 F.Supp. 391 (S.D.Iowa 1968) at 410 and cases cited there.

**1132**

607, 620 (7th Cir. 1969), cert. den. 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504; United States v. Frazier, 394 F.2d 258 (4th Cir. 1968), cert. den. 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445; Bailey v. United States, 410 F.2d 1209 (10th Cir. 1969); Dauer v. United States, 189 F.2d 343 (10th Cir. 1951), cert. den. 342 U.S. 898, 72 S.Ct. 232, 96 L.Ed. 672.

■ That no one defendant will testify for a co-defendant at a joint trial, but that every defendant might make exculpating statements for each co-defendant at a severed trial is not grounds for severance. Garnett v. United States, 404 F.2d 26 (5th Cir. 1968), cert den. 394 U.S. 949, 89 S.Ct. 1288, 22 L.Ed.2d 484; United States v. Kilgore, 403 F.2d 627 (4th Cir. 1968), cert. den. 394 U.S. 932, 89 S.Ct. 1204, 22 L.Ed.2d 462; United States v. Wolfson, 294 F.Supp. 267, 276 (D.C.Del.1968). Even though each defendant has claimed that at a severed trial he would make certain statements favorable to the other defendants, it must be remembered that a defendant who does take the stand as a witness and testifies waives his Fifth Amendment privilege not to answer questions about that crime. Johnson v. United States, 318 U.S. 189, 195, 63 S.Ct. 549, 87 L.Ed. 704 (1943); 8 Wigmore on Evidence § 2276 (McNaughton rev. 1961). Thus, it is hard to believe that a defendant, who will not waive his privilege at a joint trial, will do so at a severed trial. *See* Gorin v. United States, 313 F.2d 641 (1st Cir. 1963).

Defendants argue that severance should be granted if the government is to offer any document prepared or signed by one defendant which implicates any of the other defendants in either the conspiracy charge or any of the substantive counts. This argument is based on (1) the assumption that no defendant will take the stand in a joint trial and (2) on an extension of *Bruton* and Rule 14. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) prohibited the introduction of a confession of one defendant who did not take the stand at a joint trial where that con-

fession inculpated the co-defendant, because the non-confessing defendant was denied his right to confrontation and because the introduction of such confession was so prejudicial, it could not be cured by any instructions to the jury. *Bruton* relied heavily on the 1966 amendment to Rule 14 which provides a procedure the court may utilize in deciding a severance motion, *viz.*, " * * * the court may order the attorney for the government to deliver to the court for inspection *in camera* any *statements* or confessions made by the defendants which the government intends to introduce in evidence at the trial." (emphasis added) Thus, *Bruton* speaks of confessions; Rule 14 speaks of *statements and confessions*; and the defendants would now have us extend the severance principles to any *documents* which were signed by any of the defendants and would implicate any of the other defendants in any of the transactions involving LL&T. This Court has not been cited to any case where such an extension has been made, nor does it think such an extension is proper.

The *Bruton* rule was enunciated because the non-confessing co-defendant was not afforded adequate protection from the damaging admission of a confession which was hearsay evidence as to him. *Bruton* relies on two principles. The first is that the non-confessing defendant who has been inculpated in the confession of his co-defendant who refuses to take the stand has a Sixth Amendment right to confront his accuser —*viz.*, the confessing co-defendant. The second principle (which expressly overruled Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957)), is that juries are unable to follow the trial judge's instruction that the confession introduced is not to be considered in determining the guilt of the non-confessing defendant.

*Bruton* emphasizes that confessions and inculpatory statements have a very strong impact on juries. The ordinary citizens serving on the jury attributes great significance to the truth of a con-

fession. Juries generally know a confession can only be used in trial if it has been voluntarily given by a defendant fully apprised of the *Miranda* warnings. But documents which are formed in the ordinary passage of time and business dealings do not carry the same overall admission of criminal wrongdoing. Thus, the damning impact of a confession is absent in such documents. Accordingly, *Bruton* should not, in the absence of a strong showing in a peculiar factual situation, be extended to such documents.

Cases decided after *Bruton* either apply *Bruton* literally or interpret *Bruton* restrictively. *See*, United States v. Kershner, 432 F.2d 1066 (5th Cir. 1970); Caton v. United States, 407 F.2d 367 (8th Cir. 1969), cert. den. 89 S.Ct. 2149. *See also*, Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

 For these reasons, all the defendants' motions for severance are denied without prejudice. However, in an abundance of caution, and in conformity with Rule 14, F.R.Crim.P., the Court will order the government to produce for an *in camera* inspection all statements and confessions they intend to introduce into evidence at the trial. The defendants will be ordered to produce all documents they have been furnished by the government which they believe fall within the ambit of the *Bruton* rule. After this *in camera* inspection, the Court, if satisfied a *Bruton* situation exists, will give the government the option of either not introducing this evidence at the joint trial or introducing it, but at a severed trial.

### ORDER

For the foregoing reasons, IT IS THE ORDER OF THE COURT that

1—Count 14 be, and the same is hereby, DISMISSED;

2—On the day of trial the United States Attorney SUPPLY to all the defendants copies of the grand jury testimony of Glennon and James;

3—On the day of trial the government PROVIDE the defense with a list of all witnesses who appeared before the grand jury;

4—The United States Attorney, within ten days of this order, SUBMIT to the Court, in accordance with Rule 14, F.R. Crim.P., any confession or statement it intends to introduce into evidence;

5—The defendants, within ten days of this order, SUBMIT, in accordance with Rule 14, F.R.Crim.P., any document they have been furnished by the government which they believe to be within the ambit of the *Bruton* rule.

6—Defendant Anzelmo's motion for a speedy trial be, and the same is hereby, GRANTED; and

7—A pre-trial conference be, and the same is hereby, SET for Saturday, November 7, 1970, at 10:00 a.m. in Chambers of this Court.